## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| LAWRENCE HIGGINS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Docket No. 1:21-cv-00369-NT |
| | ) |
| HUHTAMAKI, INC., et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS

Before me are two motions by the Defendants to dismiss the First Amended Complaint ("**FAC**"). For the reasons stated below, the motions are **GRANTED IN PART** and **DENIED IN PART**.

## FACTUAL BACKGROUND

This case arises out of the alleged discharge, distribution, disposal, and spreading of per- and polyfluoroalkyl substances and their constituents (collectively, "**PFAS**") by paper mills owned and operated by the Defendants in and around Central Maine. FAC ¶¶ 1–2, 10, 29, 34, 36, 37, 38, 41 (ECF No. 58). The Defendants used and disposed of PFAS as a part of their mill operations.[1] FAC ¶¶ 1, 10, 33, 35, 36, 37, 39–40, 43–44, 69. The Plaintiffs, who own and/or occupy various pieces of real property (the "**Properties**") in Fairfield, Maine, allege that the Defendants' disposal of PFAS-contaminated byproducts through the operation of their mills resulted in PFAS

---

[1] Some of the mills at issue are still in operation, and, at oral argument, counsel for the Plaintiffs indicated that some of this behavior remains ongoing. For the sake of clarity, I refer to all of this activity as having occurred in the past.

leaching into the groundwater and aquifers and ultimately contaminating the Plaintiffs' wells, land, plants, and animals, as well as the Plaintiffs' bodies. FAC ¶¶ 3–10, 75.

Defendant Huhtamaki, Inc., ("**Huhtamaki**") and its predecessor companies have owned and operated the Huhtamaki Mill in Waterville since 1903. FAC ¶¶ 29–32. Defendant Sappi North America, Inc., f/k/a S. D. Warren Company, ("**Sappi**") and its predecessor companies have owned and operated the Somerset Mill in Skowhegan since at least 1982. FAC ¶¶ 34–35. Defendant Kimberly-Clark Corporation ("**Kimberly-Clark**") and its predecessor company owned and operated the Winslow Paper Mill in Winslow from 1950 until it was dismantled in 1997. FAC ¶ 36. Defendants Northern SC Paper Corporation ("**Northern SC Paper**") and UPM-Kymmene, Inc., ("**UPM**") formed a partnership that owned and operated the Madison Mill in Starks from 1980 until it closed in 2016. FAC ¶ 37. Defendant International Paper Company ("**International Paper**") established the Androscoggin Paper Mill in Jay in 1965. FAC ¶ 38. That mill was subsequently acquired by Defendant Billerud Americas Corporation[2] ("**Billerud**"), which owned it until 2019 when Defendant Pixelle Specialty Solutions ("**Pixelle**") acquired the mill. FAC ¶¶ 39–40. International Paper and its predecessor companies also owned and operated the Bucksport Paper Mill from 1930 until 2006. FAC ¶¶ 41–44. In 2006, Billerud purchased the mill, which it owned until shuttering the mill in 2014. FAC ¶ 44.

---

[2]     Defendant Billerud Americas Corporation was known as Verso Corporation when this case was first filed, but its motion to amend its name was recently granted, due to a company name change. Assented-to Mot. to Change Party Name (ECF No. 78); Order (ECF No. 79).

The FAC does not indicate where these six mills (the "**Mills**") are (or were) located in relation to the Properties or the distance from the Mills to the Properties. Given the address information for the Plaintiffs, *see* FAC ¶¶ 3–9, and the general location of the Mills, I take judicial notice, *see* Fed. R. Evid. 201, of the fact that the Huhtamaki Mill and Somerset Mill are just a few miles from the Properties. I also take judicial notice of the fact that Winslow is approximately ten miles southeast of the Properties, Starks is approximately twenty miles northwest of the Properties, Jay is approximately thirty miles southwest of the Properties, and Bucksport is approximately fifty miles east of the Properties.

The Defendants used PFAS in making paper products at each of the Mills. FAC ¶ 69. The processes used to make these products create residuals or byproducts— primarily wastewater or sludge, which is sometimes converted to biosolids—that are heavily contaminated with PFAS. FAC ¶ 70. The Defendants disposed of these byproducts by discharging them into wastewater treatment facilities, discharging them as surface water, placing them in landfills, and selling or distributing them as fertilizers and soil enhancers. FAC ¶ 71.

Although the allegations in the FAC are mostly quite general, the FAC provides more specific allegations for some of the Defendants. For example, the Plaintiffs allege that, between 1984 and 1989, Sappi deposited its PFAS-contaminated waste on 305 acres of twenty-one fields in Fairfield. FAC ¶ 73.[3]

---

[3]    The FAC attributes this dumping to "S. D. Warren Co. k/n/a Kimberly-Clark," FAC ¶ 73, but S. D. Warren Co. is the predecessor company for Sappi, FAC ¶ 12, not Kimberly-Clark. This allegation stems from a database prepared by the Maine Department of Environmental Protection. *See* FAC ¶ 73; Defs. UPM and Northern SC Paper's Joint Mot. to Dismiss Purusuant [sic] to Fed. R. Civ. P. 12(b)(6)

International Paper and Billerud have also spread significant amounts of PFAS-containing biosolids on fields, FAC ¶ 73, although the location of these fields is unknown. Huhtamaki contributed a significant amount of PFAS-contaminated waste to the Kennebec Sanitary Treatment District plant, and the resulting PFAS-contaminated sludge and biosolids were spread on fields near the Properties. FAC ¶ 74.

PFAS that are deposited on the ground are all but certain to migrate through the soil to groundwater and aquifers and through runoff to nearby lands and waterways. FAC ¶ 72. Their path of contamination is virtually impossible to predict. FAC ¶ 72. This results in uneven distribution of the chemicals in the soil and in groundwater and in uneven contamination of wells. FAC ¶¶ 77, 79. Sometimes contaminated wells are in close proximity to uncontaminated properties. FAC ¶ 79. Maine has determined that it is unsafe for a well to be contaminated with PFAS in amounts greater than 20 parts per trillion. FAC ¶ 61. The Plaintiffs' wells exceed this level by at least a magnitude of six. FAC ¶ 61.

PFAS are harmful to human health in the quantities to which the Plaintiffs have been exposed. FAC ¶ 45. They are readily absorbed after oral exposure and accumulate primarily in the serum, kidney, and liver. FAC ¶ 53. They interfere with the normal functioning of the endocrine system. FAC ¶ 55. They can adversely affect

---

("**Second Defs.' Mot.**") 10 & n.5 (ECF No. 70). And this database confirms that this allegation pertains to Sappi, not Kimberly-Clark. *See* Maine Dep't Env't Prot., EGAD Septage and Sludge Sites, https://www.arcgis.com/apps/webappviewer/index.html?id=468a9f7ddcd54309bc1ae8ba173965c7 ("**MDEP Database**") (last visited June 22, 2022).

the immune system. FAC ¶ 56. PFAS have been linked to cancer, thyroid disease, high cholesterol, obesity, ulcerative colitis, gestational hypertension, hypertension, kidney disease, diabetes, preeclampsia, reduced immunological functioning, and a diminished responsiveness to vaccines. FAC ¶ 57. These types of impairments can manifest years after exposure to PFAS. FAC ¶ 57. Studies have shown that significant PFAS exposure more than doubles the risk of contracting COVID-19 and of having a severe form of the disease. FAC ¶ 58. It also greatly increases the risk of intensive care or death. FAC ¶ 58.

The Plaintiffs used their contaminated well water for drinking, cooking, bathing, watering their lawns and gardens, and watering their animals.  FAC ¶ 62. And they have suffered physiological and economic consequences as a result. They have all had their blood, tissue, and organs contaminated with these chemicals and have suffered damage to their endocrine and immune systems. FAC ¶ 62. Examples of adverse effects suffered by the Plaintiffs as a result of their PFAS exposure include obesity, diabetes, COVID-19 infections (even after vaccination and boosting), influenza (even after vaccination), hypertension, gestational hypertension, and borderline preeclampsia. FAC ¶ 63. The Plaintiffs, who are now aware that they have consumed contaminated water for years, have suffered significant mental anguish and emotional distress because of present and future health concerns for themselves and their children. FAC ¶ 66.

In addition, the Plaintiffs have suffered economic consequences from this contamination. Their homes and soil have been contaminated with PFAS, and the

Plaintiffs will continue to be exposed to these chemicals until their homes, properties, and wells are fully remediated, which is difficult to do. FAC ¶¶ 53, 64. The Plaintiffs have also endured the closing of a daycare, the loss of produce from gardens, and issues with poultry production. FAC ¶ 65.

The FAC puts forward seven counts against all eight defendants: negligence (Count I), nuisance (Count II), statutory nuisance (Count III), negligent infliction of emotional distress ("**NIED**") (Count IV), medical monitoring (Count V), trespass (Count VI), and abnormally dangerous activity/ultrahazardous activity/strict liability (Count VII).[4] In their prayer for relief, the Plaintiffs primarily seek compensatory damages, including for physical and emotional distress and for medical monitoring.

## PROCEDURAL BACKGROUND

The Plaintiffs originally filed this case in state court, and Huhtamaki then removed the case to federal court. Notice of Removal (ECF No. 1); Compl. (ECF No. 1-1). The Defendants (as well as some other defendants who have now been dismissed) subsequently filed a joint motion to dismiss (ECF No. 52) and a joint motion for oral argument (ECF No. 53) (the "**Original Motions**"). Shortly before filing a response to the Original Motions (ECF No. 59), the Plaintiffs filed the FAC. And the Defendants filed two new motions to dismiss—one by Huhtamaki, International Paper, Kimberly-Clark, Pixelle, Sappi, and Billerud (the "**First Motion Defendants**") and one by UPM and Northern Paper (the "**Second Motion**

---

[4]      The parties appear to construe Count II as a public nuisance claim and Count III as a private nuisance claim. I do the same.

**Defendants**"). Because the FAC substantially changed the state of play, the Original Motions are **DENIED** as moot.

The motion to dismiss filed by the First Motion Defendants ("**First Defs.' Mot.**") begins with a facial attack against the FAC as a whole, arguing that the Plaintiffs' allegations are too generalized and nonspecific to state a plausible claim for relief. First Defs.' Mot. 3–4 (ECF No. 68). In particular, the First Motion Defendants fault the Plaintiffs for failing to plead particular facts about how each individual defendant proximately caused their harms. First Defs.' Mot. 3–4. The Second Motion Defendants have filed a separate motion to dismiss ("**Second Defs.' Mot.**") that makes a similar and even more forceful argument about this supposed lack of specific allegations, especially pertaining to causation. Second Defs.' Mot. 5–11 (ECF No. 70).

The First Motion Defendants go on to make a series of additional arguments that pertain specifically to the public nuisance (Count II), NIED (Count IV), medical monitoring (Count V), and strict liability (Count VII) claims. First Defs.' Mot. 4–20. The Second Motion Defendants adopt these arguments in their motion.[5] Second Defs.' Mot. 11. The Defendants argue that the Plaintiffs cannot sustain their public nuisance claim because they have not alleged an injury that is special and distinct from the public at large. First Defs.' Mot. 13–15. They argue that the NIED claim is

---

[5]     The Plaintiffs object to allowing the Second Motion Defendants to adopt these arguments, arguing that doing so is an end-run around Local Rule 7(d)'s page limit cap. Pls.' Resp. to Defs. UPM-Kymmene, Inc. and Northern SC Paper Corp.'s Joint Mot. to Dismiss Pursuant to Fed. R. of Civ. P. 12(b)(6) ("**Pls.' Resp. to Second Defs.' Mot.**") 17–18 (ECF No. 71). This objection is overruled.

not viable because the Defendants did not owe the Plaintiffs the necessary duty. First Defs.' Mot. 15–17. As for the medical monitoring claim, the Defendants contend that there is no such cause of action or remedy under Maine law. Defs.' Mot. 4–12. And, finally, the Defendants claim that the strict liability count fails because the use or disposal of PFAS in the papermaking process is not an abnormally dangerous activity. First Defs.' Mot. 17–20.

## LEGAL BACKGROUND

When evaluating a motion to dismiss, I take "as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021) (quoting *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011)). To be able to get past the motion to dismiss stage, the Plaintiffs need not put forward "detailed factual allegations," but they must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" and more than " 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). They also cannot make " 'naked assertions' devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly*, 550 U.S. at 557).

Instead, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557). In evaluating the plausibility of a claim, it is helpful to examine the claim against the background of the elements of a prima facie case for liability. *Germanowski v. Harris*, 854 F.3d 68, 72 (1st Cir. 2017). But "[i]t is not necessary to plead facts sufficient to establish a prima facie case at the pleading stage." *Id.* (quoting *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir. 2013)).

## DISCUSSION

### I.   The Plausibility of the Plaintiffs' Claims

#### A.   Causation

The Defendants acknowledge that the Plaintiffs have pleaded that they have been harmed by the leaching of PFAS onto their properties.[6] But the Defendants contend that the Plaintiffs' factual allegations are insufficient to connect the Defendants' behavior to the Plaintiffs' harm—i.e., causation. This, the Defendants say, requires dismissal of the entire FAC. First Defs.' Mot. 4; Second Defs.' Mot. 12.

---

[6]      Although the Defendants take issue with the concreteness of the harm suffered by the Plaintiffs, Defs. Huhtamaki, Inc., Int'l Paper Co., Kimberly-Clark Corp., Pixelle Specialty Sols., Sappi N. Am., Inc., and [Billerud Americas] Corp.'s Joint Mot. to Dismiss ("**First Defs.' Mot.**") 9 (ECF No. 68), when construing the FAC in the light most favorable to the Plaintiff, I conclude that each of the Plaintiffs alleges harm to his/her endocrine and immune systems, as well as other adverse effects, FAC ¶¶ 62–63. The Plaintiffs are not required to further specify at this stage which harms are attributable to each particular plaintiff.

Under Maine law, a proximate cause is one where "the evidence and inferences that may reasonably be drawn from the evidence indicate that [a defendant's] negligence played a substantial part in bringing about or actually causing the injury or damage and that the injury or damage was either a direct result or a reasonably foreseeable consequence of the negligence." *Crowe v. Shaw*, 2000 ME 136, ¶ 10, 755 A.2d 509. In the asbestos context, the Law Court has found that a plaintiff must establish a "product nexus, meaning that the plaintiff was exposed to the defendant's asbestos-containing product, and medical causation, meaning that such exposure was a substantial factor in causing the plaintiff's injury." *Grant v. Foster Wheeler, LLC*, 2016 ME 85, ¶ 16, 140 A.3d 1242.[7] Extrapolating that to this case—and filtering this standard through the lens of a motion to dismiss—the Plaintiffs need to allege sufficient facts to make a plausible case that they were exposed to waste from each of the Defendants and that exposure to that waste was a substantial factor in causing the Plaintiffs' injuries.

It is true that many of the Plaintiffs' allegations are relatively general. With the exceptions of Sappi and Huhtamaki, the Plaintiffs have not offered any factual allegations that directly trace the Defendants' disposal of PFAS-contaminated waste to the contamination of their Properties. In other words, the FAC's allegations are somewhat sparse with respect to causation. Nevertheless, the Defendants offer no

---

[7]    "The Law Court has not yet decided what amount of exposure a plaintiff must show" to establish that that exposure was a substantial factor in causing the injury. *Coffin v. AMETEK, Inc.*, Docket No. 2:18-cv-472-NT, 2020 WL 5552113, at *5 n.5 (D. Me. Sept. 16, 2020).

support for the idea that such fine-grained specificity is required with respect to causation.

At the pleading stage, the Defendants are only entitled to sufficient notice of the claims against them. *Redondo Waste Sys., Inc. v. Lopez-Freytes*, 659 F.3d 136, 141 (1st Cir. 2011). That is, they are entitled to sufficient notice of the claims as a whole, not any particular elements. *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 82 (1st Cir. 2013). "[I]t is neither necessary nor desirable to balkanize the plausibility standard element by element." *Id.* To survive a motion to dismiss, "a complaint does not have to evince a 'one-to-one relationship between any single allegation and a necessary element of the cause of action.' " *Id.* (quoting *Rodrígues-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 55 (1st Cir. 2013)). "Rather, the plausibility standard should be applied to the claim as a whole." *Id.* "The critical question is whether the claim, viewed holistically, is made plausible by 'the cumulative effect of the factual allegations' contained in the complaint." *Id.* (quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 14 (1st Cir. 2011)). Accordingly, I need not scrutinize the Plaintiffs' causation allegations to the extent the Defendants contend; rather, I must look to their claim as a whole to evaluate whether they have plausibly alleged that the Defendants contributed to their alleged harm.

As I see it, the Plaintiffs make three allegations that, when read in the context of the FAC as a whole, push the Plaintiffs' claims across the plausibility line. First, they allege that the Defendants (i.e., *all* of the Defendants) disposed of PFAS-contaminated waste by discharging it into wastewater treatment facilities,

discharging it as surface water, placing it into landfills, and selling or distributing it as biosolids for fertilizer and/or soil enhancers. FAC ¶ 71. Second, they allege that after PFAS-contaminated waste is disposed of, the chemicals are all but certain to migrate through the soil to groundwater and aquifers and through runoff to nearby lands and waterways. FAC ¶ 72. And third, they allege that these waste products ultimately reached and contaminated the Properties, as well as the Plaintiffs' bodies. FAC ¶ 75.

While the Plaintiffs have not pinpointed particular times when particular defendants made particular waste deposits that contaminated their land, the law does not require such perspicacious specificity. The Plaintiffs have alleged that each Mill produced PFAS-contaminated waste at a site reasonably close to Fairfield[8] and that the Defendants disposed of that waste. Although the Plaintiffs' specific allegations with respect to this disposal are comparatively thin, the Plaintiffs allege four methods of disposal—discharge into wastewater treatment facilities, discharge as surface water, placement into landfills, and usage as fertilizers or soil enhancers— that contributed to the contamination of their land. I can infer from the context of the FAC and from "common sense," *Iqbal*, 556 U.S. at 679, that these methods of disposal would have taken place at sites reasonably close to the Mills. And, given the Plaintiffs' allegations about dispersal via groundwater and aquifers, it is plausible that these

---

[8]     I recognize that some of the Mills are closer to the Properties than others. And, to be sure, if a defendant's mill were hundreds of miles away from the Properties, more specific allegations would be required to help explain why it is plausible that such defendant's waste was able to travel such a great distance to make its way to the Properties. But, as I explain above, in the context of the FAC as a whole, it is plausible that waste from the Mills was able to travel a relatively short distance (a maximum of approximately fifty miles and oftentimes much less) to the Plaintiffs' properties.

chemicals would then travel even farther from these disposal sites, particularly over lengthy periods of time—after all, the Mills have been disposing of PFAS-contaminated waste for decades.[9] The geographic proximity of the Mills to the Properties, combined with the Plaintiffs' factual allegations about how these chemicals were disposed of and how they disperse once disposed of, makes it plausible that the contamination of the Properties resulted from chemicals produced at the Defendants' nearby Mills.[10]

The Defendants (particularly the First Motion Defendants) mostly ignore the Plaintiffs' allegations in FAC ¶¶ 71, 72, and 75. Instead, they criticize the Plaintiffs for making "generalized allegations" against all eight Defendants. First Defs.' Mot. 3–4; Second Defs.' Mot. 7–9. But the Defendants offer no support for the idea that it is problematic for the Plaintiffs to make one allegation against all eight defendants versus making the same allegation eight times against each of the defendants.

The Defendants also conflate the Plaintiffs' factual and legal allegations. That is, the Defendants argue that the Plaintiffs have made "conclusory allegations . . . without sufficient supporting factual allegations." First Defs.' Mot. 3; *accord* Second Defs.' Mot. 4 (referring to "conclusory allegations"). But the allegations that the

---

[9]      The Plaintiffs allege that PFAS can persist in the environment indefinitely, which is why they are known as "forever chemicals." FAC ¶ 48.

[10]      The Second Motion Defendants point to the MDEP Database to make the point that they never had a license to spread the waste from the Madison Mill anywhere near Fairfield. Second Defs.' Mot. 10. I do not find this to be dispositive of the Second Motion Defendants' liability for three reasons. First, the Plaintiffs have alleged multiple ways in which the Defendants deposited waste on the Plaintiffs' land, beyond such activities that would be permitted by such a license. Pls.' Resp. to Second Defs.' Mot. 16–17. Second, as I explain above, the Plaintiffs have alleged that PFAS migrate to nearby lands through groundwater and aquifers. Third, just because a license would be required to spread this waste does not mean that the Second Motion Defendants did not act without a license.

Defendants identify as conclusory are indeed factual allegations, and they can only be classified as conclusory when they are extracted from the broader context of the FAC. This is not a case where the Plaintiffs' allegations "are so threadbare that they omit any meaningful factual content" and are actually "naked conclusions" masquerading as factual allegations. *See Maddox*, 732 F.3d at 79–81 (concluding that Plaintiffs' allegations that a journal article with false information had led to their losses in their malpractice trials were entirely baseless and should not be credited). Rather, the FAC sets forth a chain of events that, when interpreted in the light most favorable to the Plaintiffs, leads to the plausible conclusion that the Defendants' disposal of PFAS-contaminated waste from the Mills contributed to the contamination of the Properties.

### B.   Comparator Cases

I also find it significant that the Defendants have failed to identify any cases where similar allegations to the Plaintiffs' have been dismissed at the motion to dismiss stage. Instead, the Defendants point to four cases where the plaintiffs' allegations were much more meager than is the case here.

In one such case, the plaintiffs alleged that the defendants' mineral extraction was contaminating the plaintiffs' residential areas through blasting, fracking, and drilling. *Haywood v. Caretta Mins., LLC*, Civil Action No. 1:19-00264, 2020 WL 1520245, at *1 (S.D. W. Va. Mar. 30, 2020). The court found a number of deficiencies in the complaint, including that the plaintiffs had failed to plead: (1) where they specifically lived (instead only pleading that they lived in one very large county); (2) where the defendants were specifically conducting their blasting/fracking/drilling

operations (i.e., whether it was near where the plaintiffs lived); (3) any timeframe when the defendants' actions or plaintiffs' injuries occurred; or (4) any explanation for which specific actions by each defendant caused the plaintiffs' injuries.[11] *Id.* at *2– 3 & n.5. Thus, the court concluded, the plaintiffs had neither given the defendants fair notice of the grounds on which their claims rested nor provided a sufficient factual basis for their claims to plead a plausible case. *Id.* at *4.

Unlike in *Haywood*, the Plaintiffs have included almost all of these details in the FAC. They pleaded their specific addresses. FAC ¶¶ 3–9. They pleaded where the Defendants' operations occurred. FAC ¶¶ 29–44. They provided a timeframe for when the Defendants conducted these operations. FAC ¶¶ 29–44, 73. While they have not pleaded a timeframe with respect to most of their injuries, they have with respect to their well contamination. FAC ¶ 61 & Ex. A. And they have identified how the Defendants caused their injuries. FAC ¶¶ 70–75.

The Defendants also point to a Massachusetts environmental contamination case involving a lawsuit against companies that had manufactured and sold a firefighting agent (known as AFFF) containing a PFAS chemical. *Barnstable Cnty. v. 3M Co.*, Civil Action No. 17-40002, 2017 WL 6452245, at *1–2 (D. Mass. Dec. 18, 2017). The Town of Barnstable had used a piece of land for fire training that involved application of AFFF, and the Town subsequently found a PFAS chemical in its

---

[11]   The court did note that "exact attribution of causation to each defendant [was] not necessary at the pleading stage" but only highlighted this lack of detail as being emblematic of the broader point that the plaintiffs had not included sufficient detail in their complaint. *Haywood v. Caretta Mins., LLC*, Civil Action No. 1:19-00264, 2020 WL 150245, at *3 (S.D. W. Va. Mar. 30, 2020).

groundwater. *Id.* at *2–3. The problem with the plaintiff's complaint, the court found, was that it never specified which of the defendants' products were used or why the plaintiff believed the specific manufacturers it had sued (as opposed to other manufacturers of AFFF) were the manufacturers of the AFFF used by the Town. *Id.* at *11. Rather, the Town conclusorily asserted that because the defendants manufactured AFFF, they were liable. *Id.* The court found that the plaintiff compounded this problem by referencing the defendants collectively in the complaint without providing any "details to plausibly allege that each of these defendants and their products" were responsible for the environmental contamination. *Id.*

The difference between the *Barnstable* case and the case at bar is that the Plaintiffs here have provided specific allegations as to why these particular creators of PFAS-contaminated waste are responsible for the contamination of their property. The Defendants each operated mills reasonably close to Fairfield, and it is reasonable to infer, given the context of all of the Plaintiffs' allegations, that because all of the Defendants created the waste near Fairfield, they also disposed of their waste near Fairfield. In *Barnstable*, on the other hand, there was no apparent rhyme or reason as to why the plaintiff chose to sue the particular defendants in that case.

The Defendants also point to a toxic tort case in New York to try to support their objections. In that case, the plaintiffs owned or rented properties that they say were exposed to toxic substances emanating from a town landfill. *Andres v. Town of Wheatfield*, Case No. 1:17-cv-00377, 2020 WL 7764833, at *1 (W.D.N.Y. Dec. 30, 2020). Various entities disposed of waste in the landfill, and that waste then migrated

out of the landfill. *Id.* at \*2. And while the case was partially dismissed as to three defendants, that was only because the plaintiffs failed to allege that those three defendants had disposed of waste at the landfill. *Id.* at \*10–11. Here, by contrast, the Plaintiffs have alleged that *all* of the defendants disposed of waste that ultimately ended up contaminating their properties.

The Defendants point to one other PFAS contamination case in support of their arguments. In that case, various operators of New York State public water systems contaminated with PFAS sued multiple manufacturers, sellers, licensors, and distributors of PFAS and PFAS-containing products, alleging that the defendants had directed their activities towards New York, where their PFAS-containing products were used and disposed of by third parties (manufacturers, distributors, and consumers) in a manner that allegedly resulted in the contamination of natural resources throughout the state. *SUEZ Water N.Y. Inc., v. E.I. du Pont de Nemours & Co.*, --- F. Supp. 3d ---, 20-cv-10731, 2022 WL 36489, at \*2–3 (S.D.N.Y. Jan. 4, 2022). To explain the theory is to demonstrate how attenuated the causal chain was in that case. The plaintiffs never alleged that the defendants *themselves* manufactured, produced, or discharged PFAS-containing materials in New York State, but only that they had marketed and sold products to *users* in the state. *Id.* at \*14. The court found that these "allegations of injury caused through the agency of the end users" was "speculative and attenuated." *Id.* at \*16. The court noted that there was "no basis to conclude that the quantities of [PFAS] sent into New York by the . . . Defendants and disposed of by third parties were sufficient to be a 'substantial factor' in any pollution

of Plaintiff's water systems." *Id.* at \*16. And the court also criticized the plaintiffs for trying to create a causal link between the defendants' commercial activities in New York as a whole (an extremely large geographic area) and the plaintiffs' water systems located in one small portion of the state, particularly since there was no allegation that those products were used in the vicinity of the plaintiffs' facilities. *Id.* at \*16. That case is far afield from the case before me, where the Plaintiffs have sued the parties who they claim directly contaminated their land—not those who distributed products that allegedly resulted in environmental contamination.

"[T]he plausibility standard [is to] be applied to [a plaintiff's] claim as a whole. *Maddox*, 732 F.3d at 82. Evaluating a complaint at the motion to dismiss stage is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. In viewing the FAC through this lens, I find that the Plaintiffs have pleaded sufficient facts to make out a plausible case that the Defendants caused the Plaintiffs' alleged harm.

## II.   Public Nuisance Claim

The Defendants next argue that the Plaintiffs' public nuisance claim (Count II) should be dismissed because the Plaintiffs have failed to allege special harm. A public nuisance involves "an unreasonable interference with a right common to the general public." *St. Hilaire v. City of Auburn*, No. CIV.A.AP-02-023, 2003 WL 21911064, at \*4 n.5 (Me. Super. Ct. June 12, 2003) (quoting Restatement (Second) of Torts § 821B)). Because a public nuisance affects a public right, "[o]rdinarily, only the State may take action against a public nuisance." *Id.* (citing *Smedberg v. Moxie Dam Co.*, 92 A.2d 606 (1952)). An individual plaintiff can only bring suit if "he has suffered

18

. . . some special and peculiar damages other and greater than those sustained by the public generally." *Brown v. Watson*, 47 Me. 161, 162 (1859).

Accordingly, for a private plaintiff to be able to bring an action for public nuisance under Maine law, it must be the case that "the defendant has violated or threatens to violate a public right and the plaintiff has suffered an injury different in kind from that sustained by the public generally." *Hanlin Grp., Inc. v. Int'l Mins. & Chem. Corp.*, 759 F. Supp. 925, 935 (D. Me. 1990). "It is not enough for a private plaintiff to show that he has suffered 'the same kind of harm or interference but to a greater extent or degree' as other members of the public." *Arriaga v. New Eng. Gas Co.*, 483 F. Supp. 2d 177, 187 (D.R.I. 2007) (quoting Restatement (Second) of Torts § 821c cmt. b). Examples of harm that are not special injuries are harms suffered from exposure to mercury, *id.*, or losses in property value or the right to use and enjoy one's property, *Hanlin*, 759 F. Supp. at 936.

A highway obstruction is a classic example that illustrates the point. Such an obstruction is a public nuisance that tends to. affect everyone in the same manner (through "the impairment of a common right"), if not to the same degree. *Johnson v. 3M*, No. 4:20-cv-8-AT, 2021 WL 4745421, at *62 (N.D. Ga. Sept. 20, 2021) (quoting *Savannah, F. & W. Ry. Co. v. Parish*, 45 S.E. 280, 280–81 (Ga. 1903)). It inconveniences people in various ways, such as by worsening traffic, by forcing people to drive on unfamiliar roads, or by forcing people to take a longer or more circuitous route. But those are not special harms. They are harms experienced by everyone, even though some might be more inconvenienced than others. However, if someone were

to get injured by that obstruction in an atypical way, such as if someone drives over the obstruction and gets hurt, that is a special injury for which the plaintiff may recover. *Id.* The harm to the injured driver is different in kind rather than simply in degree.

The Defendants do not argue that the Plaintiffs have failed to allege an unreasonable interference with a right common to the general public. Indeed, the Plaintiffs claim that their water sources have been contaminated. But the Defendants object that the Plaintiffs have been unable to identify any special and peculiar damages.

Most of the damages that the Plaintiffs have suffered are not atypical. Their contaminated water and the harms that have directly flowed from that (e.g., the health consequences and effects on farming) are common to the general public and differ only in terms of degree. Although the Plaintiffs emphasize the uneven contamination of the well water, Pls.' Resp. to First Defs.' Mot. 16–17 (ECF No. 72), that is not a special harm. All area wells are at risk, and the fact that some wells are contaminated more than others (including some that are not contaminated at all) is not a difference in the kind of harm suffered but only in the *degree* of harm suffered.

But there is one harm that the Plaintiffs allege that they have suffered that might be considered a special harm, and that is their need to decontaminate their properties and water. FAC ¶¶ 53, 64. In the PFAS contamination context, one court has found a distinction between the harm suffered by the general public that results from contaminated water—which interferes with the use and enjoyment of the

20

water—versus the harms suffered by property owners who must pay the added costs of having to remove the PFAS contamination from their properties. *See Johnson*, 2021 WL 4745421, at \*62–63. The Defendants offer no basis for distinguishing this case, and I find it persuasive. Because I find that the Plaintiffs have alleged a special harm, the motions to dismiss the Plaintiffs' public nuisance claim are **DENIED.**

## III.    NIED

To make out an NIED claim, the Plaintiffs must prove that the Defendants owed them a duty, that the Defendants breached that duty, that the Plaintiffs were harmed, and that the Defendants' breach caused their harm. *Curtis v. Porter*, 2001 ME 158, ¶ 18, 784 A.2d 18. The Defendants' motions focus on the duty element. "Although each person has a duty to act reasonably to avoid causing physical harm to others, there is no analogous general duty to avoid negligently causing emotional harm to others." *Id*. Rather, such a duty only arises in limited circumstances, the only one relevant here being where "a special relationship exists between the actor and the person emotionally harmed." *Id*. ¶ 19.[12]

The Plaintiffs rely on broad language from a 1987 Law Court decision to argue that an NIED claim can be brought without having to show a special relationship. Pls.' Resp. to First Defs.' Mot. 18 (citing *Gammon v. Osteopathic Hosp. of Me., Inc.*,

---

[12]    A negligent infliction of emotional distress ("**NIED**") claim can also arise in bystander liability actions (where a bystander witnesses something horrific). *Curtis v. Porter*, 2001 ME 15, ¶ 19, 784 A.2d 18. And while the Law Court has also held that an NIED claim can be brought when the wrongdoer has committed another tort, that doctrine appears to be obsolete. *Id*. Where the separate tort at issue allows "recover[y] for emotional suffering, the claim for [NIED] is usually subsumed in any award entered on the separate tort," and where the separate tort does not allow for recovery of emotional harm, "a plaintiff may not circumvent that restriction by alleging [NIED] in addition to the separate tort." *Id*.

534 A.2d 1282 (Me. 1987)). But the broad language in *Gammon* has since been narrowed. *See Cameron v. Pepin*, 610 A.2d 279, 282 (Me. 1992) ("[N]otwithstanding *Gammon*'s broad language, whether one party owes a duty of care to another necessarily involves considerations beyond the factual determination that a particular injury was a foreseeable consequence of some particular conduct."). And if it was not clear enough from *Cameron* and *Curtis*, it became clearer in *Steadman v. Pagels* that there are only two viable paths to asserting an independent NIED claim. *See* 2015 ME 122, ¶ 26, *as amended* (Mar. 1, 2016), 125 A.3d 713 ("[I]ndependent claims for NIED may be viable in bystander claims or when the parties stand in a 'special relationship' to each other."); *see also Fisk v. Mid Coast Presbyterian Church*, 2:16-cv-00490-JDL, 2017 WL 1755950, at *8 (D. Me. May 4, 2017) ("The claim of negligent infliction of emotional distress requires the existence of a 'special relationship' that creates a duty between the actor and the person who is emotionally harmed.").

A special relationship has been found in only narrow circumstances, such as between a doctor and patient, between a hospital and the family of the deceased, or between a psychotherapist and a patient. *Fiacco v. Sigma Alpha Epsilon Fraternity*, 484 F. Supp. 2d 158, 176–77 (D. Me. 2007), *aff'd,* 528 F.3d 94 (1st Cir. 2008). Nothing close to that type of intimate relationship exists here, and the Plaintiffs do not argue otherwise.[13] Accordingly, the motions to dismiss the Plaintiffs' NIED claim are **GRANTED**.

---

[13]     I note that should the Plaintiffs ultimately be able to prove one or more of their other tort claims, they may be able to recover for emotional damages, *see Steadman v. Pagels*, 2015 ME 122,

## IV.    Medical Monitoring

Count IV is a claim for medical monitoring, although, in their prayer for relief, the Plaintiffs also seek compensatory damages for medical monitoring. The Defendants and the Plaintiffs blur the lines between the Plaintiffs' ability to bring a freestanding claim for medical monitoring versus their ability to seek compensatory damages for medical monitoring as a remedy for one of their other claims. The Defendants take the position that medical monitoring is not available as a freestanding claim or as a remedy. First Defs.' Mot. 4. The Plaintiffs' opposition focuses exclusively on the medical monitoring claim, Pls.' Resp. to First Defs.' Mot. 8–13, although, at oral argument, Plaintiffs' counsel classified the claim and the remedy as being "interrelated," analogizing to an injunction. But while the two may be interrelated, they are distinct, and I analyze them separately. I begin with the viability of a freestanding medical monitoring claim.

### A.    Medical Monitoring Claim

When faced with a question of state law, a federal court sitting in diversity "must make an informed prophecy as to the state court's likely stance." *Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co.*, 547 F.3d 48, 51–52 (1st Cir. 2008). It is the role of the federal courts "to apply [their] best understanding of the principles Maine has adopted . . . not . . . to expand Maine law; that is left to the courts of Maine." *Douglas v. York Cnty.*, 433 F.3d 143, 149 (1st Cir. 2005).

---

¶ 26, *as amended* (Mar. 1, 2016), 125 A.3d 713, including for any emotional distress resulting from fear of future illness, *Murray v. Bath Iron Works Corp.*, 867 F. Supp. 33, 49–50 (D. Me. 1994).

It is undisputed that no medical monitoring cause of action currently exists in Maine. So, in order to allow this cause of action to proceed, I would have to create it. Setting aside the fact that a federal forum is not the best place to do that, *see id.*, in the past, the Law Court has been reticent to use its authority to create a new cause of action and has opted to "defer to the legislature's consideration of the public policy issues involved in the proposed extension of tort liability." *Durepo v. Fishman*, 533 A.2d 264, 265 (Me. 1987).

Moreover, even beyond this judicial skepticism with regard to extending tort liability, the Law Court has previously held in the asbestos context that exposure to asbestos dust without concrete injury is insufficient to sustain a negligence action. *See Bernier v. Raymark Indus., Inc.*, 516 A.2d 534, 542 (Me. 1986). "There is generally no cause of action in tort until a plaintiff has suffered an identifiable, compensable injury." *Id.* So, a plaintiff who is exposed to an environmental toxin does not have a judicially recognizable claim "until there has been a manifestation of physical injury . . . sufficient to cause him actual loss, damage or suffering." *Id.* at 543. Given this precedent, I am convinced that the Law Court would not authorize a medical monitoring cause of action, and I am disinclined to do so here. Count IV is **DISMISSED**.[14]

---

[14]     While the Plaintiffs ask to certify to the Law Court whether a medical monitoring claim is cognizable, that seems unnecessary given the strong evidence that such a claim would not be recognized. *See Hugel v. Milberg, Weiss, Bershad, Hynes & Lerach, LLP*, 175 F.3d 14, 18 (1st Cir. 1999). Moreover, the Law Court will accept questions for certification only when "all material facts have been either agreed upon or resolved, and the case is in such posture that [its] decision will, in at least one alternative, be 'determinative of the cause,' " meaning that "the Federal controversy is terminated." *Hiram Ricker & Sons v. Students Int'l Meditation Soc'y*, 342 A.2d 262, 264 (Me. 1975) (quoting *White v. Edgar*, 320 A.2d 668, 674–75 n.10, 677 (Me. 1974)). That is not the case here.

## B.    Medical Monitoring Remedy

It is a separate question whether, if the Plaintiffs have suffered physical harm, they could recover, as a part of their damages award, compensatory damages[15] for any medical monitoring that they might require in order to ensure that their condition does not worsen. "Tort damages . . . are intended to make the plaintiff whole by compensating him or her for any injuries or losses proximately caused by the defendant." *Est. of Hoch v. Stifel*, 2011 ME 24, ¶ 41, 16 A.3d 137 (quoting *Reardon v. Lovely Dev., Inc.*, 2004 ME 74, ¶ 9, 852 A.2d 66)). Such damages cannot be "uncertain, contingent, or speculative" and must be supported by "[s]ome evidence of the amount of the loss sustained." *Id.* ¶ 43 (quoting *Wood v. Bell*, 2006 ME 98, ¶ 21, 902 A.2d 843 and *Reardon*, 2004 ME 74, ¶ 8, 852 A.2d 66).

Following this hornbook law, it seems clear that there are certain situations in which a plaintiff may receive damages to compensate for medical monitoring that she must undergo because of a defendant's unlawful conduct. How expansive such liability could potentially be remains to be determined. All that the law appears to require to recover such damages is that two prerequisites are met. First, as *Bernier* made clear, to be able to recover in tort, a plaintiff must have "suffered an identifiable, compensable injury," which requires "a manifestation of physical injury . . . sufficient to cause him actual loss, damage or suffering." 516 A.2d at 542–43. It is not clear to me how extensive this actual harm must be given that *Bernier* did not involve actual

---

[15]     I note that the Plaintiffs have not sought the remedy of an injunction ordering the Defendants to implement a medical monitoring program. *See Sullivan v. Saint-Gobain Performance Plastics Corp.*, 431 F. Supp. 3d 448, 451 (D. Vt. 2019). I thus only consider the permissibility of a damages order.

harm but only a heightened risk of harm. *See id.* at 542; *cf. In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 2010 ME 93, ¶ 8, 4 A.3d 492 (holding that time and effort alone spent to avoid reasonably foreseeable harm is not a cognizable injury).

The Plaintiffs allege that they have suffered obvious physical harms, such as various medical conditions, FAC ¶ 63, but they also allege that they have suffered damage to their immune and endocrine systems, FAC ¶ 62. Whether damage to a plaintiff's immune system or endocrine system would be sufficiently concrete to constitute physical harm requires further factual development. *Cf. Bernier*, 516 A.2d at 543 ("Even assuming that any inhalation of asbestos dust immediately causes microscopic injury to lung tissues, we conclude that the subclinical injury resulting from such inhalation is insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law." (internal quotation marks omitted)). But once a plaintiff is able to establish physical injury, it may be the case that she can recover damages for medical monitoring, even potentially damages that occurred prior to the onset of that physical injury. *See Gonzales v. Sweetser*, No. BCD-CV-20-21, 2020 WL 6596389, at *2 n.5 (Bus. & Consumer Ct. Oct. 13, 2020, *Duddy, J.*) ("[The plaintiff] could engage in credit monitoring and other protective measures, and then seek recovery for unreimbursed mitigation costs in the event of any actual harm.").

Second, the Plaintiffs can only recover damages that "relate to some separate cause of action which permits recovery" for compensatory damages. *See S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 64 (1st Cir. 2000) (asserting the

same for punitive damages). But, assuming the Plaintiffs prevail on such a cause of action, I see no reason why they cannot recover the full extent of their injuries, even if that includes costs for medical monitoring.

## V.  Strict Liability

Maine recognizes the doctrine of strict liability for abnormally dangerous activity and has adopted the Restatement's six-factor test for evaluating whether an activity is abnormally dangerous. *Dyer v. Me. Drilling & Blasting, Inc.*, 2009 ME 126, ¶ 15, 984 A.2d 210. This test considers the:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
>
> (b) likelihood that the harm that results from it will be great;
>
> (c) inability to eliminate the risk by the exercise of reasonable care;
>
> (d) extent to which the activity is not a matter of common usage;
>
> (e) inappropriateness of the activity to the place where it is carried on; and
>
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 520. Ordinarily, several of these factors must be present for there to be strict liability, but not all of them need be, "especially if others weigh heavily." *Id.* cmt. f. "The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even though it is carried on with all reasonable care." *Id.* "In general, abnormal dangers

arise from activities that are in themselves unusual, or from unusual risks created by more usual activities under particular circumstances." *Id.*

The Defendants criticize the Plaintiffs for not outlining allegations pertaining to each factor. Such criticism is misplaced. *See Andres*, 2020 WL 7764833, at *8 (allowing plaintiffs' strict liability claim to proceed even though they had not made specific allegations as to each Restatement factor). The Plaintiffs are not required to make plausible allegations with respect to each individual element of a claim, *Maddox*, 732 F.3d at 82, and it makes even less sense to require them to do so with respect to each aspect of a multi-factor test that is subordinate to an element of a claim.

In terms of evaluating whether the Defendants engaged in an abnormally dangerous activity, strict liability only applies "to ultrahazardous or abnormally dangerous *activities* . . . not to ultrahazardous or abnormally dangerous *materials*." *BHK Realty, LLC v. Narragansett Elec. Co.*, 542 F. Supp. 3d 133, 138–39 (D.R.I. 2021); *see In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, Civil Action No. 2:13-md-2433, 2015 WL 4092866, at *18–19 (S.D. Ohio July 6, 2015) (explaining that "the activity itself" must be abnormally dangerous, "not simply the conditions that result"); *Read v. Corning Inc.*, 351 F. Supp. 3d 342, 358 (W.D.N.Y. 2018) (finding that the disposal of ordinary materials that just happen to contain hazardous chemicals "is not so inherently dangerous as to give rise to strict liability.").

The Plaintiffs allege that the use and disposal of PFAS-contaminated byproducts is the relevant activity that must be evaluated for purposes of strict

liability. FAC ¶¶ 127–32. I find it difficult to evaluate whether this activity is inherently dangerous under the Restatement's test at this stage of the litigation. While I understand that whether an activity is abnormally dangerous is a question of law, to answer that question, I must rely on factual information, which has not yet been developed. *See* Restatement (Second) of Torts § 520 cmt. l; *Cornett v. Northrop Grumman Corp.*, No. 18-CV-06453, 2020 WL 59794, at *2–3, *8 (E.D.N.Y. Jan. 6, 2020) (denying motion to dismiss strict liability claim in case involving PFAS contamination, concluding that "additional fact-finding" was required). All six factors—the risk of harm caused by disposing PFAS-contaminated waste, the likelihood of that harm, the ability to eliminate the risk of that harm through the exercise of reasonable care, how common the production of PFAS-contaminated waste is, the appropriateness of disposing of PFAS-contaminated waste on the lands at issue, and the economic value of the use and disposal of these PFAS-contaminated byproducts—are intensely factual inquiries. The parties' back and forth in the papers and at oral argument only makes this clearer. As a result, it is not possible to resolve this issue at the motion to dismiss stage. *See Andres*, 2020 WL 7764833, at *8.

## CONCLUSION

For the reasons stated above, I **GRANT IN PART** and **DENY IN PART** the Defendants' motions to dismiss (ECF Nos. 68, 70). Counts IV and V are **DISMISSED**. The Original Motions (ECF Nos. 52, 53) are **DENIED** as moot.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 23rd day of June, 2022.