UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| LAWRENCE HIGGINS, et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | 1:21-cv-00369-JCN |
| | ) | |
| HUHTAMAKI, INC., et al., | ) | |
| | ) | |
| Defendants | ) | |

**ORDER ON MOTION TO DISMISS**

Plaintiffs, homeowners in Fairfield, Maine, allege Defendants, which consist of the operator of a paper mill in Waterville, Maine, and three chemical companies, are responsible for contaminating their groundwater wells and exposing them to health risks from per- and polyfluoroalkyl substances (PFAS).  (Complaint, ECF No. 1-1; Third Amended Complaint, ECF No. 227.)  Residual PFAS from the paper mill's manufacturing processes were allegedly discharged into surface water, onto lands, and into the wastewater system, contaminating biosolids from the nearby water treatment facility, which biosolids were then spread as fertilizer on agricultural fields near Plaintiffs' homes, contaminating their property and groundwater.  Defendants Solenis, BASF, and 3M (collectively "Supplier Defendants") argue that Plaintiffs have not alleged an actionable claim against them and seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). (Motion to Dismiss, ECF No. 237.)

After consideration of the parties' arguments and the factual allegations in the operative complaint, the Court denies the motion.

BACKGROUND[1]

## A. PFAS Characteristics and History

PFAS are a group of human-made chemicals characterized by multiple fluorine atoms bonded along a chain of carbon atoms. (*See* Third Amended Complaint ¶¶ 1, 27, 29.) PFAS are sometimes referred to as "forever chemicals" because they are particularly stable and break down slowly in the environment due to the strength of fluorine-carbon bonds. (*Id.* ¶¶ 29–30.) Because many PFAS are lipophobic and hydrophobic, they have been used in the production of certain paper and cardboard packaging since the 1950s to prevent the material from absorbing fats and water. (See *id.* ¶¶ 49–50.)

The Supplier Defendants manufactured and sold PFAS for commercial purposes. (*Id.* ¶¶ 74–76.)[2] Defendant 3M pioneered the manufacture of PFAS chemicals with the development of perfluorooctanoic acid (PFOA) starting in the early 1950s. (*Id.* ¶ 78.) Defendant 3M conducted studies in the 1950s and early 1960s that showed its perfluorooctanesulfonate (PFOS) accumulates in the human body and is toxic. (*Id.* ¶ 81.) By the 1970s, additional 3M studies revealed that its PFOS products were "even more toxic" than previously believed. (*Id.*) In 1999, a 3M scientist resigned in protest saying that he could "no longer participate" in a 3M process that put "markets, legal defensibility

---

[1] The following summary is drawn from the third amended complaint and all well-pleaded facts are accepted as true for purposes of the motion to dismiss. *See McKee v. Cosby*, 874 F.3d 54, 59 (1st Cir. 2017).

[2] Defendant Solenis International LLC, formerly Ashland Hercules Water Technology, is a corporation organized under the laws of Delaware with a principal place of business in Wilmington, Delaware. (*Id.* ¶ 13.) Defendant BASF is a corporation organized under the laws of New Jersey with a principal place of business in Florham Park, New Jersey. (*Id.* ¶ 14.) Defendant 3M is a corporation organized under the laws of Minnesota with a principal place of business in Maplewood Minnesota. (*Id.* ¶ 15.)

2

and image over environmental safety" while describing PFAS as one of the most insidious chemicals in existence.  (*Id.* ¶ 82.)  In 2006, the United States Environmental Protection Agency (EPA) sanctioned Defendant 3M $1.5 million for failing to report that it had discovered adverse health effects from PFAS.  (*Id.* ¶ 83.)  The other Supplier Defendants allegedly had similar knowledge and information about the dangers of PFAS but continued to sell the chemicals.  (*Id.* ¶ 84.)

## B.   The Paper Mill and PFAS Discharges

Since 1999, Defendant Huhtamaki has owned and operated a paper mill in Waterville, Maine.  (*Id.* ¶¶ 1, 45.)[3]  The mill has used PFAS as part of its operations since at least 1980. (*Id.* ¶ 46.)  The manufacturing process created residuals or byproducts—mainly in the form of wastewater or sludge—containing high levels of PFAS.  (*Id.* ¶ 51.) The PFAS remained chemically unaltered in the residuals or byproducts.  (*Id.* ¶¶ 51, 53, 86.)

Defendant Huhtamaki disposed of the residuals or byproducts by discharge into the local sewer or discharge as surface water.  (*Id.* ¶ 52.)  The discharge ultimately became comingled with other waste in biosolids or sludge that was used as fertilizer and spread on farms.  (*Id.* ¶¶ 52, 56, 70, 99.)  Defendant Huhtamaki is the largest single contributor to the Kennebec Sanitary Treatment District plant.  (*Id.* ¶ 57.)  The PFAS-containing discharge

---

[3] Defendant Huhtamaki, Inc., is a corporation organized under the laws of Kansas and with a principal place of business in De Soto, Kansas.  (Third Amended Complaint ¶ 12.)  Between 1903 and 1999, the mill was owned and operated by Keyes Fibre Company.  (*Id.* ¶ 45.)  Keyes Fibre Company was a product of at least two phases of corporate restructuring involving Rex Pulp Product Company and Arcata National Corp.  (*Id.* ¶¶ 44–45.)

contaminated the treatment plant's sludge and/or biosolids, which were transported to fields in the region. (*Id.*) Once deposited on the ground or otherwise discharged into sewers or as surface waters, the PFAS migrated through the soil to groundwater and aquifers and through runoff to nearby lands and waterways. (*Id.* ¶ 54–55.)

The Supplier Defendants were allegedly responsible for the overwhelming majority—if not the entirety—of the sales of PFAS-containing products to Defendant Huhtamaki. (*Id.* ¶ 73.) The Supplier Defendants were aware of how Defendant Huhtamaki used their chemicals, and actively advised on the use of the PFAS chemicals in the paper product manufacturing process. (*Id.* ¶ 85.) According to Plaintiffs, the Supplier Defendants knew that the discharges from the manufacturing process would be laden with residual PFAS. (*Id.* ¶ 86.) Plaintiffs also maintain that the Supplier Defendants also knew that Defendant Huhtamaki would discharge its residuals or byproducts into the sewer system, into waterways, or on the ground, and that such uncontained discharges would almost certainly contaminate the environment, aquifers, and drinking water. (*Id.* ¶ 88.) Despite their knowledge that Defendant Huhtamaki's byproducts or residuals would be highly contaminated with their PFAS products, the Supplier Defendants did not warn Defendant Huhtamaki of the hazardous nature of the contaminated byproducts or residuals. (*Id.* ¶ 87.)

## C.    **Health Effects and Safety Guidelines**

PFAS have been categorized as endocrine disruptors and immunotoxic. (*Id.* ¶ 36–37.) Health risks that have been associated with exposure to PFAS include cancer, thyroid disease, high cholesterol, ulcerative colitis, kidney disease, hypertension, obesity,

gestational hypertension and preeclampsia, as well as reduced immunological functions, including decreased responsiveness to vaccines. (*Id.* ¶ 38–39.) Historically, water treatment systems did not test and/or filter PFAS from the water supply. (*Id.* ¶ 32.) Chlorine and other disinfectants that are typically added to drinking water systems did not and do not remove PFAS chemicals from water. (*Id.* ¶ 33.)

Due to concerns about PFAS exposure in humans and associated health risks, in June 2021, the Maine legislature required all community water systems in the state to monitor for the PFAS compounds listed by the EPA and to mitigate and continue to monitor any well with combined PFAS levels above twenty nanograms per liter (or twenty parts per trillion). (*Id.* ¶ 40.) In June 2022, the EPA published health advisories for the four most common PFAS, including PFOA and PFOS. (*Id.* ¶ 41.) According to the EPA, the levels "below which adverse health effects are not anticipated to occur" are .004 parts per trillion for PFOA and .02 parts per trillion for PFOS, which levels fall below the threshold of detection for most laboratories. (*Id.*)

### D.   **Plaintiffs and Well Testing**

Plaintiffs are fifteen individuals who own or occupy seven properties in Fairfield, Maine. (*Id.* ¶¶ 5–11.) Each of Plaintiffs' wells was tested by the state government. (*Id.* ¶¶ 62, 92.) The test results showed PFAS contamination at levels between 6 and 1,300 times higher than the 20 parts per trillion combined safe level established by the State of Maine. (*Id.*) The highest result was 1,787,500 times higher than the level at which the EPA would not expect adverse health effects. (*Id.* ¶¶ 63, 93.) Plaintiffs allege that the PFAS in their well water came from the biosolids or sludge spread on fields near their

homes, which included PFAS from the paper mill's byproducts or residuals that the Supplier Defendants provided to Defendant Huhtamaki.  (*Id.* ¶¶ 48, 56, 59, 66.)  Plaintiffs drank, cooked with, and bathed in the contaminated well water; used the well water on their lawns and gardens; and used it as drinking water for their animals.  (*Id.* ¶¶ 64, 94.) Plaintiffs maintain they have suffered personal and financial harm as the result of PFAS exposure.[4]

### E.     The Lawsuit

Plaintiffs initially filed suit in state court against Defendant Huhtamaki and several other companies.  (Complaint, ECF No. 1-1.)  Defendant Huhtamaki removed the case to federal court.  (Notice of Removal, ECF No. 1.)  Following the filing of motions to dismiss filed by certain defendants, Plaintiffs voluntarily dismissed several entities, the Court dismissed certain claims, and Plaintiffs filed amended pleadings.  (Notices of Voluntary Dismissal, ECF Nos. 51, 55, 57, 122, 229; First Amended Complaint, ECF No. 58; Order on Motion to Dismiss, ECF No. 81; Second Amended Complaint, ECF No. 115.)

Plaintiff then filed the Third Amended Complaint, which is the operative pleading. (Third Amended Complaint, ECF No. 227 (hereinafter "the complaint").)  The Supplier Defendants subsequently moved to dismiss the complaint against them.

---

[4] Some of the alleged health challenges include obesity, diabetes, COVID infection after vaccination and boosting, influenza infection after vaccination, hypertension, gestational hypertension, and borderline preeclampsia.  (*Id.* ¶¶ 65, 95.)  Plaintiffs assert that their homes have been contaminated by PFAS-laden water, dust, and steam.  (*Id.* ¶¶ 66, 96, 100.)  The PFAS contamination has caused loss of enjoyment of Plaintiffs' property and economic loss, including but not limited to the closing of a daycare facility, the loss of produce from gardens, and the loss of poultry production.  (*Id.* ¶¶ 67, 97.)  Plaintiffs also allege significant mental anguish and emotional distress over their current and future health, and the health of their children. (*Id.* ¶¶ 68, 98.)

**LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted." In reviewing a motion to dismiss under Rule 12(b)(6), a court "must evaluate whether the complaint adequately pleads facts that 'state a claim to relief that is plausible on its face.'" *Guilfoile v. Shields*, 913 F.3d 178, 186 (1st Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In doing so, a court "assume[s] the truth of all well-pleaded facts and give[s] the plaintiff the benefit of all reasonable inferences therefrom." *Id.* (quoting *Thomas v. Rhode Island*, 542 F.3d 944, 948 (1st Cir. 2008)). The complaint, however, may not consist entirely of "conclusory allegations that merely parrot the relevant legal standard." *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 231 (1st Cir. 2013). Rule 12(b)(6) "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To evaluate the sufficiency of the complaint, therefore, a court must "first, isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements, then take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Zell v. Ricci*, 957 F.3d 1, 7 (1st Cir. 2020) (quotation marks and modification omitted).

**DISCUSSION**

The complaint includes the following counts: (1) a negligence claim against Defendant Huhtamaki, (2) a nuisance claim against Defendant Huhtamaki, (3) a statutory

nuisance claim against Defendant Huhtamaki, (4) a trespass claim against Defendant Huhtamaki, (5) a strict liability abnormally dangerous activity claim against Defendant Huhtamaki, (6) a negligence claim against the Supplier Defendants, (7) a strict products liability claim against the Supplier Defendants,[5] (8) a nuisance claim against the Supplier Defendants, and (9) a statutory nuisance claim against the Supplier Defendants.[6]

## A.      Failure to Warn—Negligence and Product Liability

### 1.      Elements

To prove a negligence claim, a plaintiff must establish "a duty owed, a breach of that duty, and an injury to the plaintiff that is proximately caused by a breach of that duty." *Stanton v. Univ. of Maine Sys.*, 2001 ME 96, ¶ 7, 773 A.2d 1045, 1049.  In general, "[w]hether a party owes a duty of care to another is a question of law," while "the breach and proximate cause issues are questions of fact."  *Welch v. McCarthy*, 677 A.2d 1066, 1069 (Me. 1996).

The judicial and legislative development of strict liability occurred "as a result of policy considerations that manufacturers, sellers and suppliers have a duty not to place defective, unreasonably dangerous products into the stream of commerce and that those

---

[5] The Supplier Defendants argued that, to the extent the complaint was unclear, Plaintiffs' "strict liability" claim should be construed as a product liability claim rather than an ultrahazardous activity claim.  The interpretation is reasonable given that Plaintiffs asserted an abnormally dangerous activity claim against Defendant Huhtamaki and did not include similar language in Count VII against the Supplier Defendants. Plaintiffs have not in their motion filings disputed the Supplier Defendants' interpretation of the strict liability claim.

[6] The motion to dismiss involves the last four counts (those against the Supplier Defendants) but some of the Supplier Defendants' arguments implicate certain allegations Plaintiffs have asserted in support of one or more of their claims against Defendant Huhtamaki.

who do so should be held responsible for injuries which thereafter occur as a result."

*Adams v. Buffalo Forge Co.*, 443 A.2d 932, 941 (Me. 1982).  Under Maine's product liability statute, 14 M.R.S. § 221,[7] which is based on § 402(A) of the Restatement (Second) of Torts, the elements of a strict liability claim are:

(1) the named defendant sold the goods or products;
(2) those goods or products were in a defective condition unreasonably dangerous to the user or consumer or the user or consumer's property;
(3) the plaintiff might reasonably have been expected to use, consume, or be affected by the goods or products;
(4) the defendant was engaged in the business of selling the goods or products;
(5) the goods or products were expected to, and did, reach the user or consumer without significant change in the condition in which they were sold; and
(6) the plaintiff or the plaintiff's property suffered physical harm.

*Burns v. Architectural Doors & Windows*, 2011 ME 61, ¶ 23 n.7, 19 A.3d 823, 830.

A product can be unreasonably dangerous "as a result of an error in the manufacturing or design process or by the failure to warn of a product hazard."  *Bernier v. Raymark Indus., Inc.*, 516 A.2d 534, 537 (Me. 1986).  To establish a strict product liability claim based on a failure to warn against a risk from the product, a plaintiff must also prove:

---

[7] The statute provides that:

One who sells any goods or products in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume or be affected by the goods, or to his property, if the seller is engaged in the business of selling such a product and it is expected to and does reach the user or consumer without significant change in the condition in which it is sold. This section applies although the seller has exercised all possible care in the preparation and sale of his product and the user or consumer has not bought the product from or entered into any contractual relation with the seller.

14 M.R.S. § 221.

"(1) the defendant had a duty to warn the plaintiff of the product hazard; (2) any actual warning on the product was inadequate; and (3) the inadequate warning or absence of a warning proximately caused the plaintiff's injury." *Burns v. Architectural Doors & Windows*, 2011 ME 61, ¶ 23, 19 A.3d at 830.  Although a strict liability manufacturing or design defect claim does not depend on the seller's fault, "[a] strict liability failure-to-warn case does resemble a negligence action because the reasonableness of the manufacturer's conduct is the critical issue." *Bernier* 516 A.2d at 540; *see also*, *Pottle v. Up-Right, Inc.*, 628 A.2d 672, 675 (Me. 1993) ("Regardless of whether a failure to warn claim is phrased in terms of negligence or strict liability, the analysis is basically the same") (quotation marks and modifications omitted).

### 2.    Duty to Warn

The Supplier Defendants argue they had no duty to warn Plaintiffs regarding the risks of exposure to PFAS.  "As a general rule, the duty to warn is the duty to exercise reasonable care to inform the user," which means "the supplier generally has the duty to warn all those who are members of a class whom the supplier should expect to use the item supplied." *Koken v. Black & Veatch Const., Inc.*, 426 F.3d 39, 48 (1st Cir. 2005) (internal quotation marks and modifications omitted).  While the scope of the duty owed ordinarily involves "the question 'whether the defendant is under any obligation for the benefit of the particular plaintiff,' it is not entirely a question of the foreseeable risk of harm but is in turn dependent on recognizing and weighing relevant policy implications." *Cameron v. Pepin*, 610 A.2d 279, 282 (Me. 1992) (quoting Prosser, Law of Torts § 53 (4th ed. 1971) (internal citations omitted).

10

Plaintiffs have not alleged in the complaint nor argued in their opposition to the motion to dismiss that they are part of a class of individuals the Supplier Defendants should have expected to use the PFAS products. Instead, Plaintiffs maintain that they are members of a class the Supplier Defendants should have expected to be exposed to the PFAS products through another entity's use of the products.

In their strict liability failure to warn claim against the Supplier Defendants, Plaintiffs do not appear to assert that the Supplier Defendants owed a duty to warn Plaintiffs directly. Rather, Plaintiffs' allegations focus on the Supplier Defendants' failure to warn Defendant Huhtamaki and other users of the PFAS risks. (Third Amended Complaint ¶ 175.) Consistent with that focus, Plaintiffs allege, "[h]ad the [Supplier Defendants] properly disclosed the risks associated with PFAS, Plaintiffs would never have been exposed to excessive levels of the toxic chemicals because Huhtamaki would have either not used those toxic PFAS chemicals or it would have properly disposed of their PFAS laden waste." (*Id*. ¶ 174.) The Supplier Defendants contend that only Defendant Huhtamaki can assert the claim and, therefore, that Plaintiffs lack standing to assert a claim based on any duty owed to Defendant Huhtamaki.

When product liability doctrines first developed, whether a bystander or third party who was injured by a defective or dangerous product could assert a strict liability claim was an unsettled question. *See* Restatement (Second) of Torts § 402A, caveat 1 and comment o. (1965) (noting that "thus far" courts "have not gone beyond allowing recovery to user and consumers" but expressing "no opinion" as to whether the restatement rules should be interpreted or extended to cover "harm to persons other than users or

consumers").  Now, however, "the bystander is accorded the protection of" a legal claim "in most jurisdictions" when an injury results from another's use "for which [the product] was intended or for which it is reasonably foreseeable that [the product] may be used." Lindahl, B., *Plaintiffs in strict liability actions–Bystanders*, 3 Modern Tort Law: Liability and Litigation § 26:118 (2d ed. 2023).

Maine's product liability statute was evidently an example of the expansion foreshadowed in the Restatement commentary because the statute applies not only to "users" or "consumers" but also to anyone whom "the seller or supplier might reasonably have expected to . . . be affected by the goods . . . ."  14 M.R.S.A § 221; *see also*, 14 M.R.S.A. § 161 ("Lack of privity . . . shall be no defense in any action brought against the manufacturer, seller or supplier of goods under [§] 221 or for negligence . . . if the plaintiff was a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume *or be affected by the goods*") (emphasis supplied).

When analyzing the issue under negligence principles, "[t]he law of Maine on the duty of a manufacturer to warn of the dangers involved when using its product comes directly from the Restatement (Second) of Torts § 388 (1965)."[8] *Johnson v. H.K. Webster,*

---

[8] The text of that section is as follows:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other *or to be endangered by its probable use*, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> > (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

*Inc.*, 775 F.2d 1, 9 (1st Cir. 1985).  The Restatement text and commentary reflect that the duty to warn the user of risks to others can be asserted by those nearby who were predictably at risk by the use of the product in the absence of an adequate warning.  *See* Restatement (Second) of Torts § 388 comment g.  ("The duty which the rule stated in this Section imposes upon the supplier of a chattel for another's use is to exercise reasonable care to give to those who are to use the chattel the information which the supplier possesses, and which he should realize to be necessary to make its use safe for them *and those in whose vicinity it is to be used*") (emphasis supplied); *id.* comment n. ("Since the care which must be taken always increases with the danger involved, it may be reasonable to require those who supply through others chattels which if ignorantly used involve grave risk of serious harm to those who use them *and those in the vicinity of their use*, to take precautions to bring the information home to the users of such chattels which it would be unreasonable to demand were the chattels of a less dangerous character") (emphasis supplied); *see also*, *Erie Ins. Co. v. W.M. Barr & Co., Inc.*, 523 F. Supp. 3d 1, 8 (D.D.C. 2021) (same); *Lucey v. Saint-Gobain Performance Plastics Corp.*, No. 117CV1054LEKDJS, 2018 WL 2926289, at *6 (N.D.N.Y. June 11, 2018) (denying PFAS manufacturers' motion to dismiss bystanders' claims because, consistent with Restatement (Second) of Torts § 388, New York law provides that a "manufacturer's duty to warn extends to third persons exposed to

---

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388 (emphasis supplied).

a foreseeable and unreasonable risk of harm by the failure to warn" but "this does not mean that, when a bystander is exposed to such a risk, the manufacturer has a duty to directly warn the bystander.  Rather, a duty to warn with respect to bystanders simply requires the manufacturer to warn the purchasers or users of the product so that the purchasers or users operate the product in a manner that reduces the bystander's exposure to a foreseeable risk of harm").

In *Joy v. E. Maine Med. Ctr.*, 529 A.2d 1364 (Me. 1987), the Maine Supreme Judicial Court, sitting as the Law Court, determined that under certain circumstances a duty to warn one individual could extend for the benefit of others and permit others to assert a claim based on the breach of the duty.  *Id.* at 1366 ("when a doctor knows, or reasonably should know that his [or her] patient's ability to drive has been affected [by the prescription or treatment], he [or she] has a duty to the driving public as well as to the patient to warn his patient of that fact").  More recently in *Grant v. Foster Wheeler, LLC*, 2016 ME 85, ¶ 21, 140 A.3d 1242, the Law Court considered a failure to warn product liability claim from the estate of a deceased man who had worked as a cleaner at a shipyard and who had testified that he was exposed to asbestos when sweeping the area after pipe covering work.  *Id.* at ¶ 2.  Although the Superior Court granted summary judgment and the Law Court affirmed because the record lacked sufficient evidence that the employee was exposed to the suppliers' products rather than other asbestos-containing products, neither court expressed concern that the employee was not a user or consumer of the asbestos products and had only alleged that he was exposed to asbestos due to other individuals' and entities'

use of the asbestos products.  *Id.* at 16, 19, 27, 32; *Grant v. Air & Liquid Systems Corp.*, No. BCDCV2013002, 2015 WL 9704898, at *4 (Me. Super. Ct. Apr. 25, 2015).[9]

As Defendants note, when discussing the product liability duty, the Law Court has at times described it as "a duty to warn the plaintiff of the product hazard."  *Pottle v. Up-Right, Inc.*, 628 A.2d 672, 675 (Me. 1993); *Bouchard v. Am. Orthodontics*, 661 A.2d 1143, 1145 (Me. 1995); *Burns v. Architectural Doors & Windows*, 2011 ME 61, ¶ 23, 19 A.3d 823, 830.  Defendants contend the language demonstrated the Law Court's view that the relevant duty in a product liability claim is the duty to warn the plaintiff.

When other Law Court and state trial court decisions are considered, the use of the language cannot reasonably be viewed as altering the standard formulation of the duty element: "A tort duty involves 'the question of whether the defendant is under any obligation for the benefit of the particular plaintiff.'"  *Davis v. R C & Sons Paving, Inc.*, 2011 ME 88, ¶ 16, 26 A.3d 787, 791 (quoting *Trusiani v. Cumberland & York Distribs., Inc.*, 538 A.2d 258, 261 (Me. 1988)).  Because none of the cases cited by Defendants involved a bystander fact pattern, the Law Court had no reason to reference anyone other than the plaintiff.  *See National Pork Producers Council v. Ross*, 598 U.S. 356, 373–74 (2023) ("The language of an opinion is not always to be parsed as though we were dealing with language of a statute" because judicial "opinions dispose of discrete cases and

---

[9] The appeal focused on the causation element, but the Superior Court did consider the plaintiff's strict liability failure to warn claim.  Although the court concluded that under the facts of the case, the defendants did not have a duty to warn, the court's decision was not based on the plaintiff's status as someone other than a user or consumer.  Presumably, if the court believed the plaintiff's status prevented him from asserting the claim, the court would not have engaged in any other analysis of the duty issue.

controversies and they must be read with a careful eye to context") (modifications and quotation marks omitted).

Several years after *Pottle* and *Bouchard*, the Law Court refined the scope of the duty recognized in *Joy* without any suggestion that it had repudiated the concept. *See Flanders v. Cooper*, 1998 ME 28, ¶ 6, 706 A.2d 589, 590. Furthermore, other Maine courts continue to cite *Joy* and *Flanders* as good law after the Law Court's decisions in *Pottle*, *Bouchard*, and *Burns*. *See e.g.*, *Dexter v. Drasby, D.O.*, No. CV-11-508, 2016 WL 1069883, at *4–5 (Me. Super. Ct. Feb. 05, 2016). In at least one case, the Superior Court relied on *Joy* as recognizing the duty to "provide adequate warning of the reasonably foreseeable risk . . . to third parties" in the same opinion in which it cited the language used in *Pottle*. *Jordan v. Cap Quality Care, Inc.*, No. CV-04-248, 2009 WL 1106423 (Me. Super. Ct. Mar. 16, 2009). Prior decisions in this district have also explicitly or implicitly endorsed claims of nonusers who were affected by a product because a manufacturer failed to warn the user. *See Dube v. Pittsburgh-Corning Corp.*, No. CIV. 83-0224 P, 1988 WL 64733, at *1, 8 (D. Me. June 9, 1988) (operator of a shipyard had a duty to warn employees or families that bystanders like family members were at risk from exposure to asbestos dust on employees' clothes), reversed in part on other grounds, *Dube v. Pittsburgh Corning*, 870 F.2d 790 (1st Cir. 1989); *Doe v. Solvay Pharms., Inc.*, 350 F. Supp. 2d 257, 263 (D. Me. 2004) ("A manufacturer or seller owes a duty to exercise reasonable care to foreseeable users of its products *and to persons who are foreseeably endangered by the use* of those products") (emphasis supplied); *Acadia Ins. Co. v. Fluid Mgmt., Inc.*, No. 2:15-CV-00008-JAW, 2015 WL 3869696, at *7 (D. Me. June 23, 2015) (same).

16

In sum, nothing in *Pottle*, *Bouchard*, or *Burns* suggests that the Law Court intended to overrule *Joy* or the other legal principles that support the ability of a third party to assert a claim based on the breach of the duty to warn a consumer or user of a product. Accordingly, the Court concludes that the language used in *Pottle*, *Bouchard*, and *Burns* was tailored to the facts of those cases and does not foreclose claims by a class of nonusers who were foreseeably affected by a product hazard resulting from a manufacturer's failure to warn the user about the danger to the nonusers.

The Supplier Defendants also argue that Plaintiffs cannot rely on the alleged duty to warn Defendant Huhtamaki about PFAS contamination because Defendant Huhtamaki was a learned intermediary or a sophisticated user. There is no duty to provide a warning about open and obvious risks that would be apparent to anyone coming into contact with a product, *Lorfano v. Dura Stone Steps, Inc.*, 569 A.2d 195, 197 (Me. 1990), and, accordingly, there is no duty to warn sophisticated users of dangers that are obvious to reasonable sophisticated users. *Koken v. Black & Veatch Const., Inc.*, 426 F.3d 39, 45 (1st Cir. 2005). Although the Law Court has not explicitly addressed the learned intermediary doctrine, "the overwhelming majority of jurisdictions hold that a supplier is absolved of the duty to warn later purchasers and users down the chain of distribution when (1) the product is sold to an intermediary with knowledge or sophistication equal to that of the manufacturer; (2) the manufacturer adequately warns this intermediary; and (3) the manufacturer can reasonably rely on the intermediary to warn the ultimate consumer." *Id.* at 49.

Plaintiffs have not alleged that Defendant Huhtamaki was a sophisticated user. Whether a person or entity is a sophisticated user typically requires a factual record and often the resolution of a factual question.  That is, the degree of Defendant Huhtamaki's sophistication or knowledge with respect to the contamination and health risks to nearby third parties is a question of fact that is ordinarily not appropriate for resolution on a motion to dismiss (provided, of course, that it is at least plausible that Defendant Huhtamaki lacked the requisite knowledge).  *See Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1338 (N.D. Ga. 2022) (finding a duty to warn the operator of a textile mill that could be asserted by injured third parties and rejecting a similar argument because "whether a risk is known to a profession is a question of fact that should not be decided on a motion to dismiss").

The Supplier Defendants contend that, under the facts alleged in the complaint, Defendant Huhtamaki cannot plausibly be anything other than a sophisticated user because Plaintiffs allege that Defendant Huhtamaki knew or should have known of the dangers of releasing residuals containing PFAS.  The argument is unavailing. The civil rules allow a plaintiff to plead in the alternative.  Fed. R. Civ. P. 8(a)(3), (d)(2), (d)(3).  The Supplier Defendants nevertheless note that courts sometimes dismiss claims that rely on incoherent or contradictory assertions of fact, and at times distinguish among alternative legal theories and alternative factual assertions. Pleading different legal theories will often require pleading somewhat different or conflicting factual assertions.  The restraints on alternative pleading, therefore, are generally limited to circumstances where a pleading includes inconsistent assertions about facts that are not legitimately in doubt or "when the pleader holds the knowledge of which of the inconsistent facts is the true one." *Mrla v. Fed. Nat'l*

18

*Mortg. Ass'n*, No. 15-CV-13370, 2016 WL 3924112, at \*4 (E.D. Mich. July 21, 2016). Here, the pleadings lack any evidence that Plaintiffs know the full extent of Defendant Huhtamaki's expertise.   Under the circumstances of this case, Plaintiffs' alternative pleading—claims against Defendant Huhtamaki that depend on Defendant Huhtamaki's knowledge and claims against the Supplier Defendants that depend on the lack of Huhtamaki's knowledge—is permissible.   *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 918 n.10 (9th Cir. 2012) (for claims against different law enforcement officers, "the complaint pleads alternative facts about who ordered the arrests and how they were ordered . . . This is permissible"); *Doe v. Fournier*, 851 F. Supp. 2d 207, 227 n.11 (D. Mass. 2012) ("the fact that two theories of recovery might be inconsistent at trial does not prevent a plaintiff from stating both theories at the early pleading stage").[10]

The Supplier Defendants also argue that dismissal is warranted because in the absence of a special relationship, a party has no duty to prevent a third party from harming others.   *See DeCambra v. Carson*, 2008 ME 127, ¶ 11, 953 A.2d 1163, 1165 ("there is no general obligation to protect others from the actions of third parties, even where one knows the third party is or could be dangerous" unless there is a recognized "special relationship" between the plaintiff and the defendant).   That rule, however, is inapposite because it pertains to "instances of nonfeasance rather than misfeasance. . . ."   *Belyea v. Shiretown Motor Inn, LP*, 2010 ME 75, ¶ 9, 2 A.3d 276, 279 (quoting *Bryan R. v. Watchtower Bible*

---

[10] The Supplier Defendants have also failed to demonstrate that the allegations in the complaint establish that Defendant Huhtamaki is an intermediary as contemplated by the doctrine.   The doctrine absolves a manufacturer of the obligation to warn subsequent purchasers or users under certain circumstances. Plaintiffs have not alleged that they are "later purchasers or users" of PFAS.

*& Tract Soc. of New York, Inc.*, 1999 ME 144, ¶ 15, 738 A.2d 839, 845.)  In other words, "absent a special relationship, the law imposes no duty to act affirmatively to protect someone from danger" created independently of the defendant's actions, but that principle is of no assistance when "the dangerous situation was created by the defendant." *Id.*  In this case, the alleged duty to warn arises from the Supplier Defendants' acts of manufacturing and selling allegedly dangerous products without adequate warnings; the claim is not based on a duty to protect against the unrelated acts of another in the absence of conduct by the Supplier Defendants.[11]

### 3.    Proximate Cause

The Supplier Defendants contend that Plaintiffs have not alleged facts that would support a finding that their conduct proximately caused Plaintiffs' alleged harm. A proximate cause is "a cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the result would not have occurred." *Holmes v. E. Maine Med. Ctr.*, 2019 ME 84, ¶ 17, 208 A.3d 792, 798 (quotation marks omitted).  The Law Court has explained that proximate cause focuses on two elements, substantiality and foreseeability:

> Evidence is sufficient to support a finding of proximate cause if the evidence and inferences that may reasonably be drawn from the evidence indicate that the [tortious conduct] played a substantial part in bringing about or actually

---

[11] To the extent Plaintiffs purport to allege the Supplier Defendants owed Plaintiffs a duty to warn them directly as within the class of people who might be exposed to PFAS, because the Court has determined that Plaintiffs have sufficiently alleged a strict liability claim based on the Supplier Defendants' failure to warn Defendant Huhtamaki, the Court does not address the issue at this time.

causing the injury or damage and that the injury or damage was either a direct result or a reasonably foreseeable consequence of the negligence.

*Tolliver v. Department of Transportation*, 2008 ME 83, ¶ 42, 948 A.2d 1223, 1236 (quoting *Merriam v. Wagner*, 2000 ME 159, ¶ 8, 757 A.2d 778, 780).  Although proximate causation is a question generally reserved to the factfinder, "[t]he mere possibility of such causation is not enough, and when the matter remains one of pure speculation or conjecture, or even if the probabilities are evenly balanced, a defendant is entitled to a judgment."  *Crowe v. Shaw*, 2000 ME 136, ¶ 10, 755 A.2d 509, 512.

The Supplier Defendants raise three arguments on causation. First, they maintain Plaintiffs' complaint is insufficient because Plaintiffs failed to describe adequately the warning that would have prevented the contamination.  The argument is unconvincing.  A plaintiff is generally not required to plead a proposed warning if the substance is reasonably clear.  *See Giordano v. Solvay Specialty Polymers USA, LLC*, 522 F. Supp. 3d 26, 40 (D. N.J. 2021) (denying motion to dismiss negligence and products liability claims, including failure to warn claim, and concluding that "[a]t this stage in the case, without the benefit of discovery, especially where 3M is likely in possession of most of the information relative to Plaintiffs' claims, Plaintiffs cannot be faulted for not articulating the precise wording of a 3M warning label or describing a specific alternative design").  Plaintiffs' allegations that the Supplier Defendants failed to warn Defendant Huhtamaki about the need to contain its residuals or outputs that became contaminated with PFAS during the manufacturing process and of the health risks to people in the vicinity if exposed to PFAS are sufficient.

Second, the Supplier Defendants maintain that causation is not plausible because Plaintiffs alleged that Defendant Huhtamaki knew or should have known about the risks of discharging residuals laden with PFAS, and thus there is no basis on which to conclude that a warning would have prevented Plaintiffs' exposure. The argument fails for the same reasons the Court rejected the Supplier Defendants' duty arguments. The extent of Defendant Huhtamaki's knowledge is uncertain and a factual record and possibly a factual determination is required to resolve Plaintiffs' contention.

Third, the Supplier Defendants argue the factual allegations do not demonstrate that a warning would have altered Defendant Huhtamaki's behavior and therefore avoided Plaintiffs' injuries. Under the facts alleged, the chain of inferences is not as long or as complex as the Supplier Defendants contend.[12] Plaintiffs allege that Defendant Huhtamaki would have properly disposed of its byproducts or used safer alternatives if it had been warned of PFAS health risks and the need for contained disposal of any residuals. The

---

[12] The Court notes that Plaintiffs allege plausible routes by which PFAS moved from the Supplier Defendants' possession to Plaintiffs and their properties, negatively impacting their health and property rights. *Cf. Grant v. Foster Wheeler, LLC*, 2016 ME 85, ¶ 16, 140 A.3d 1242, 1246 ("To establish a prima facie case in personal injury asbestos litigation, a plaintiff must demonstrate both product nexus, meaning that the plaintiff was exposed to the defendant's asbestos-containing product, and medical causation, meaning that such exposure was a substantial factor in causing the plaintiff's injury"). The alleged facts plainly distinguish the case from one Defendant cites, *SUEZ Water New York Inc. v. E.I. du Pont de Nemours & Co.*, 578 F. Supp. 3d 511 (S.D.N.Y. 2022) ("*Suez I*"). In *Suez I*, causation was lacking because the plaintiff sued manufacturers based only on the detection of PFAS in the water district and without essential facts, including the products the defendants sold, who purchased the PFAS products, and when or where they were released into the environment. *Id.* at 539–41. In this case, Plaintiffs have alleged the facts that were not alleged in *Suez I*. The allegations would support a finding of product nexus and health harms. The allegations are sufficient to support a plausible inference that Plaintiffs were exposed in significant part to the Supplier Defendant's products because (1) there is geographic proximity between the mill and the agricultural fields near Plaintiffs' homes, (2) Defendant Huhtamaki is allegedly the single largest contributor to the wastewater treatment district, and (3) the Supplier Defendants allegedly represented the overwhelming majority, if not the entirety, of the supply of PFAS-containing products that were sold to Defendant Huhtamaki.

allegations are factual, not conclusory as the Supplier Defendants argue, and are sufficient at the pleading stage.

The Court acknowledges that some courts have dismissed bystander or third-party claims when the response of the user or intermediary to any warning was speculative and could be expected to vary. *See Certainteed Corp. v. Fletcher*, 300 Ga. 327, 330, 794 S.E.2d 641, 645 (2016) ("It is not difficult to envision that, while some workers might have taken steps to protect or warn family members or other individuals with whom they came in contact, other workers might not have taken such steps").  For example, in *Koken v. Black & Veatch Const., Inc.*, 426 F.3d 39 (1st Cir. 2005), the First Circuit granted summary judgment in favor of the defendant because:

> The only evidence of causation in the record is Austin's testimony that, had the blanket been labeled "1000 degrees rated," he would have consulted his foreman.  This testimony is not sufficient for a jury to find causation because there is no follow-up testimony by the foreman as to what he would have done in response to Austin's hypothetical inquiry.  Nor is there evidence as to what the ordinary user would have understood the 1000 degree rating to mean or that, if a 1000 degree rating had been on the blanket, this would have been understood by welders to limit the blanket to particular uses or suggested that the particular use of the blanket here would have been inappropriate.  In the absence of such testimony, it would be entirely speculative for the jury to conclude that the foreman would have ordered a course of action different from that which occurred.  Indeed, Austin testified that even if the blanket had been labeled "1000 degrees rated," he likely would have used it anyway. . . .

*Id.* at 49.  Other courts, however, have taken a somewhat different approach when the user was a professional or a large or reputable business entity.  *See Knowlton v. Deseret Med., Inc.*, 930 F.2d 116, 123 (1st Cir. 1991) ("The presumption is generally accepted in most jurisdictions, including Massachusetts, that if a warning is given, it will be followed"

because "[i]t is difficult to accept that a proper warning would have been deliberately ignored," especially when it "would amount to malpractice"); *Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1338 (N.D. Ga. 2022) ("sophisticated companies . . . should be expected to take action, when adequately warned, to reduce the potential harms from their operations to humans and the environment").

Regardless of the approach to the issue, whether Defendant Huhtamaki would likely have followed a warning is an issue that requires the development of a factual record. Particularly given the alleged potential harm to those in Plaintiffs' position, the Court cannot conclude on the current pleadings that Defendant Huhtamaki's compliance with the warning can reasonably be characterized as too speculative or unexpected thereby requiring dismissal.

### 4. Other Product Liability Arguments

The Supplier Defendants argue that Plaintiffs' allegations do not satisfy a necessary element of a product liability claim—that the conduct causing injury must be an "intended use" of the product and that disposal of a product is not an intended use. The Supplier Defendants do not cite a Maine case applying an "intended use" element. Maine law requires that a plaintiff might reasonably have been expected to use, consume, or be affected by the product, which would cover foreseeable uses rather than limiting liability only to those uses that the manufacturer intended. While there might be some authority for the proposition that certain forms of "disposal" of some products are not "intended uses," many courts have endorsed claims based on the failure to warn about risks that arise during

disposal of a product even under such a standard.  *See e.g.*, *Brownlee v. Louisville Varnish Co.*, 641 F.2d 397, 401 (5th Cir. 1981).

The essence of Plaintiffs' claim is that Defendant Huhtamaki's manufacturing process involved the creation of considerable quantities of byproducts or residuals, presumably including water, pulp or fibers, and perhaps other chemicals, which were released or discharged into surface water and the wastewater system, or incorporated into fertilizer.  When Defendant Huhtamaki used PFAS in the manufacturing process, the byproducts or residuals predictably contained PFAS and therefore the various forms of discharges or releases became sources of PFAS contamination.  Given the allegations and given that Plaintiffs allege advisory and long-term relationships between the mill and the Supplier Defendants, a factfinder could plausibly conclude that the Supplier Defendants reasonably could have expected Plaintiffs to be affected by the PFAS chemicals.

The Supplier Defendants assert that the complaint fails to satisfy another element of a strict product liability claim because the harm resulted from waste, residuals, or by-products, which, according to the Supplier Defendants, demonstrates that when Plaintiffs were exposed to the products, the products had been changed significantly from the condition of the products when sold.  The Law Court "do[es] not regard a change in the manufacturer's product as significant unless the change relates to the essential features and to the safety of the product."  *Marois v. Paper Converting Mach. Co.*, 539 A.2d 621, 624 (Me. 1988).  Furthermore, "even if a substantive change is made in a product, the manufacturer will not be relieved of liability unless the change was an unforeseen and intervening proximate cause of the injury."  *Id.*

25

The Supplier Defendants' argument fails.  First, as explained above, for purposes of evaluating the motion to dismiss, the relevant duty to warn is the duty to warn Defendant Huhtamaki.   The user is thus Defendant Huhtamaki, not Plaintiffs. The Supplier Defendants do not argue that there was a significant change in the condition of the product when received by Defendant Huhtamaki.  In addition, even if a change in condition between the user and the bystander would foreclose liability, Plaintiffs have plausibly alleged that the PFAS chemicals were not substantially modified during the manufacturing process and discharge into the environment.  Plaintiffs have not alleged, for example, that the PFAS supplied were used only as a chemical precursor and turned into new chemicals for sale to third parties.  Rather, a reasonable inference from Plaintiffs' allegations is that the PFAS chemicals that were not part of the final paper or packaging products were in the residuals or byproducts.  In short, Plaintiffs have adequately alleged that in the absence of a warning, the manufacturing process, discharge, and contamination were not unforeseen intervening proximate causes of the injury.

The Supplier Defendants claim that the complaint fails to satisfy other elements of a strict product liability claim because Plaintiffs are not "intended users or consumers" of the product.  As discussed above, the Supplier Defendants have not cited any Maine authority for the inclusion of the word "intended" with the words "user" or "consumer." Also, as the Court has explained, the Court does not construe Maine law as foreclosing third-parties or bystanders from bringing claims when foreseeably harmed by the failure to warn the user about not only the risks to the user, but also of the risks to third parties or bystanders.

**B.      Nuisance**

The Maine Law Court describes the elements of a common law private nuisance

claim as:

> (1) The defendant acted with the intent of interfering with the use and
> enjoyment of the land by those entitled to that use;
> (2) There was some interference with the use and enjoyment of the land of
> the kind intended, although the amount and extent of that interference may
> not have been anticipated or intended;
> (3) The interference that resulted and the physical harm, if any, from that
> interference proved to be substantial. The substantial interference
> requirement is to satisfy the need for a showing that the land is reduced in
> value because of the defendant's conduct;
> (4) The interference that came about under such circumstances was of such
> a nature, duration or amount as to constitute unreasonable interference with
> the use and enjoyment of the land.

*West v. Jewett & Noonan Transportation, Inc.*, 2018 ME 98, ¶ 14, 189 A.3d 277, 281–82

(quotation marks and modification omitted).

The intent element "mean[s] only that 'the defendant has created or continued the

condition causing the interference with full knowledge that the harm to the plaintiff's

interests are occurring or are substantially certain to follow." *Johnston v. Maine Energy*

*Recovery Co. Partnership*, 2010 ME 52, ¶ 15, 997 A.2d 741, 745 (quoting *Charlton v.*

*Town of Oxford*, 2001 ME 104, ¶ 37 n.11 774 A.2d 366, 377).  A plaintiff can prove

substantial interference in several ways, such as (1) an invasion that "affects the physical

condition" of the property or involves "more than 'mere physical discomfort or mental

annoyance,'" *West*, 2018 ME 98 ¶¶ 15–16, 189 A.3d at 282, (2) overall market value

depreciation, (3) a reduced magnitude of appreciation, or (4) repair costs.  *Darney v.*

*Dragon Prod. Co.*, LLC, 771 F. Supp. 2d 91, 109 (D. Me. 2011), amended in part, No. 2:08-CV-47-GZS, 2011 WL 2007300 (D. Me. May 23, 2011).

A common law public nuisance is an "unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B. Public officials can pursue legal action to abate a public nuisance, but other persons only have a cause of action if the person has "suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference." Restatement (Second) of Torts § 821C; *see also*, *Brown v. Watson*, 47 Me. 161, 162 (1859) (no individual cause of action unless a person "has suffered therefrom some special and peculiar damages other and greater than those sustained by the public generally"). The special damage requirement for a public nuisance means that the factual circumstances generating an individual public nuisance cause of action are often "identical" or at least "overlap" or "are analogous" to the circumstances generating a private nuisance cause of action. 1 Maine Tort Law § 14.03.

In addition to claims arising under the common law, Maine's nuisance statute, 17 M.R.S. § 2701 et seq.,[13] also creates a cause of action. The statutory cause of action can be established in the same manner discussed above because the statute incorporates the elements of common law nuisance claims, *Johnston v. Maine Energy Recovery Co. Partnership*, 2010 ME 52, ¶ 16 n.1, 997 A.2d 741, 746, and the statute contains numerous

---

[13] Section 2701 provides that "[a]ny person injured in his comfort, property or the enjoyment of his estate by a common and public or a private nuisance may maintain against the offender a civil action for his damages, unless otherwise specially provided." *Id.*

examples of circumstances constituting nuisances, *see e.g.*, 17 M.R.S. § 2802.  One of the examples listed is the "corrupting or rendering unwholesome or impure the water of a river, stream, pond or aquifer."  *Id.*

The Supplier Defendants maintain that Plaintiffs have failed to allege an actionable nuisance claim because the Supplier Defendants did not retain control over the PFAS products after sale.  Some states have adopted a control element to preclude nuisance claims against manufacturers of products containing latent risks to users or bystanders. *See, e.g*, *In re Lead Paint Litig.*, 191 N.J. 405, 429, 924 A.2d 484, 499 (2007) (concluding a public nuisance "is related to conduct, performed in a location within the actor's control");[14] *State v. Lead Indus., Ass'n, Inc.*, 951 A.2d 428, 435 (R.I. 2008)  (defendants were not "in control of the lead pigment they, or their predecessors, manufactured at the time it caused harm to Rhode Island children").  Other jurisdictions, however, have rejected attempts to so limit nuisance claims.  *See, e.g.*, *In re MTBE Prod. Liab. Litig.*, 725 F.3d 65, 121 (2d Cir. 2013) (a nuisance claim against manufacturers existed under New York law despite lack of post-sale control because there was evidence that manufacturer continued manufacturing and selling MTBE gasoline after it knew that "station owners would store this gasoline in underground tanks that leaked" and that "once spilled, would likely infiltrate the property of others"); *People v. ConAgra Grocery Prod. Co.*, 17 Cal. App. 5th 51, 109 (2017) ("Liability for nuisance does not hinge on whether the defendant owns,

_____

[14] *But see Severa v. Solvay Specialty Polymers USA, LLC*, 524 F. Supp. 3d 381, 397 (D.N.J. 2021) (concluding the Supreme Court of New Jersey's conclusion was limited to damages claims for public nuisance and allowing private nuisance claims to proceed against PFAS manufacturers).

possesses or controls the property, nor on whether he is in a position to abate the nuisance; the critical question is whether the defendant created or assisted in the creation of the nuisance") (internal quotation marks and modifications omitted).

The Supplier Defendants cite the decision in *City of Bloomington, Ind. v. Westinghouse Elec. Corp.*, 891 F.2d 611, (7th Cir. 1989) to support their argument that Plaintiffs cannot proceed on a nuisance claim.  In the case, a city alleged, among other things, a nuisance claim based on the discharge of PCBs manufactured by Monsanto into the city's landfill, sewers, and wastewater treatment facility from a Westinghouse plant. *Id.* at 613–14.  The Seventh Circuit upheld the district court's dismissal of the nuisance claim against Monsanto in part because "the pleadings do not set forth facts from which it could be concluded that Monsanto retained the right to control the PCBs beyond the point of sale to Westinghouse." *Id.* at 614.  The Seventh Circuit, however, acknowledged that under the Restatement (Second) of Torts § 834, "[o]ne is subject to liability for a nuisance caused by an activity, not only when he carries on the activity but also when he participates to a substantial extent in carrying it on," but the court concluded that the plaintiffs had not alleged any such participation because "Monsanto made every effort to have Westinghouse dispose of the chemicals safely," such as by "accepting used PCB fluid for reclamation and incineration," affixing "a warning label" to the product, and by ceasing sales of the product once substitutes became available. *Bloomington*, 891 F.2d at 614.  Here, in contrast, based on the allegations in the complaint, a factfinder could plausibly find that the Supplier Defendants "participated to a substantial extent" in carrying on the nuisance because they allegedly knew of the risks of unconfined discharges into the environment, failed to provide

any warnings, and continued to sell PFAS to Defendant Huhtamaki despite knowing that Defendant Huhtamaki's manufacturing process was generating and discharging residuals laden with PFAS.[15]

Because the Supplier Defendants have not cited any Maine cases in which courts have included ongoing control as an element of all nuisance claims, *see Doe v. Ground Round, Inc.*, No. CIV. 00-76-B-H, 2000 WL 761018, at *1 (D. Me. May 26, 2000) ("Parties who remove their cases from state court should not expect to persuade the federal court to make new state law"), because the reasoning of courts which have applied the "participated to a substantial extent" standard is sound, and because the allegations would support a plausible inference of substantial participation in a nuisance under the principle summarized in § 834 of the Restatement, the Court concludes that Maine courts would not foreclose a nuisance claim against the manufacturers under the circumstances alleged in this case.[16]

---

[15] The Supplier Defendants also rely on *SUEZ Water New York Inc. v. E.I. du Pont de Nemours & Co.*, No. 20-CV-10731 (LJL), 2023 WL 2601161 (S.D.N.Y. Mar. 22, 2023) ("Suez II"). The *Suez II* court dismissed the plaintiff's nuisance claim and distinguished the Second Circuit's decision in the *MTBE Litigation* because the manufacturers did not substantially participate in the nuisance based only on the allegation that they knew that their customers' processes "could release PFAS" as opposed to being "substantially certain" that the customers would continue to use the product in a manner that maintained the nuisance. *Id.* at *13. Even if the Court were to find the distinction in *Suez II* persuasive, the case is distinguishable because the allegations of knowledge and advice here are sufficient to permit a plausible inference of substantial certainty and the continued sale of the products.

[16] Cases the Supplier Defendants cited are not inconsistent with this conclusion because the cases addressed the typical or representative nuisance fact pattern and did not alter the Law Court's more specific articulation of the elements of a nuisance claim. *See Johnston*, 2010 ME 52, ¶ 15, 997 A.2d 741, 745 ("A private nuisance 'consists in a use of one's own property in such a manner as to cause injury to the property, or other right, or interest of another'") (quoting *Norcross v. Thoms*, 51 Me. 503, 504 (1863)); *Bloomington*, 891 F.2d at 614 ("the essence of the tort of nuisance is one party . . . using his property to the detriment of the use and enjoyment of others") (quotation marks omitted); *Saco Steel Co. v. Saco Def., Inc.*, 910 F. Supp. 803, 812 (D. Me. 1995) ("Maine law recognizes the tort of private nuisance, which lies where a defendant's use of its own land causes injury to adjoining or neighboring land").

## CONCLUSION

Based on the foregoing analysis, the Court denies the Supplier Defendants' motion to dismiss.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 5th day of October, 2023.

---

The Supplier Defendants rely on *Saco Steel*, but the facts of that case are also distinguishable. For several decades, a manufacturer of gun barrels contracted with a scrap removal and processing company to dispose of its steel turnings and cuttings. *Saco Steel*, 910 F. Supp. at 807. The scrap company sued when the material it accepted turned out to be contaminated with hazardous substances. *Id.* at 808–09. The court denied summary judgment on several issues, including a strict liability claim and a contractual indemnification claim, but granted summary judgment on the nuisance claim, reasoning that "Defendant's alleged activity on its own land, generating hazardous substances, did not, by itself, cause injury to Plaintiff's neighboring land," and that "Plaintiff sustained injury only after Plaintiff purchased the turnings containing the alleged hazardous substances and transported them onto its own property." *Id.* at 812. If Defendant Huhtamaki had sued the Supplier Defendants for nuisance, the approach in *Saco Steel* might be more pertinent, but the Court does not find that case particularly instructive here, where Plaintiffs did not voluntarily bring the hazardous substances onto their properties pursuant to contractual agreements.