UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

LAWRENCE HIGGINS, et al.,     )
    )
       Plaintiffs     )
    )
      v.     )     1:21-cv-00369-JCN
    )
HUHTAMAKI, INC., et al.,     )
    )
       Defendants     )

## ORDER ON MOTION TO AMEND AND
## MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiffs, homeowners in Fairfield, Maine, allege Defendants, which consist of the operator of a paper mill in Waterville, Maine, and three chemical companies, are responsible for contaminating their groundwater wells and property from per- and polyfluoroalkyl substances (PFAS). (Complaint, ECF No. 1-1; Third Amended Complaint, ECF No. 227.) Residual PFAS from the paper mill's manufacturing processes were allegedly discharged into surface water, onto lands, and into the wastewater system, contaminating biosolids from the nearby water treatment facility, which biosolids were then spread as fertilizer on agricultural fields near Plaintiffs' homes, contaminating their property and groundwater wells.

Plaintiffs seek leave to file a fourth amended complaint. (Motion to Amend, ECF No. 271.) Because the motion to amend is consistent with the deadlines in the scheduling order, and because Defendants do not oppose the proposed amendments, the Court grants leave to amend the complaint. Defendants Solenis, BASF, and 3M (collectively "Supplier Defendants") argue that Plaintiffs have not alleged an actionable public nuisance claim

because they have not established a special injury separate from any injury suffered by the general public. (Motion for Judgment on the Pleadings, ECF No. 267.) After consideration of the parties' arguments and the factual allegations in the operative complaint, the Court denies the motion for judgment on the pleadings.

## MOTION FOR LEAVE TO AMEND

Rule 15(a)(1) of the Federal Rules of Civil Procedure permits a litigant to amend a pleading "as a matter of course" subject to certain time constraints. However, when a party seeks to amend a complaint more than 21 days after the filing of a responsive pleading, the other party's consent or leave of court is required in order to amend the complaint. Fed. R. Civ. P. 15(a)(2). In such a case, the court is to grant leave to amend "freely" when "justice so requires." *Id.*; *see also Foman v. Davis,* 371 U.S. 178, 182 (1962) ("In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'").

Here, the amendments contained in the proposed fourth amended complaint, (ECF No. 276-1), seek to (1) add additional similarly situated plaintiffs and (2) narrow certain issues by clarifying that Plaintiffs do not seek personal injury damages as part of the claims for relief. The motion to amend is consistent with the deadlines established in the scheduling order, which contemplated amendments to add new plaintiffs. (Amended Scheduling Order, ECF No. 260.)

2

Defendants do not oppose the substantive changes regarding personal injury damages. The Supplier Defendants request that if the Court grants the motion to amend, the Court consider the Supplier Defendants to have renewed the motion for judgment on the pleadings as to the proposed fourth amended complaint. Because the legal issues raised in the motion for judgment on the pleadings are the same whether considered as to the third amended complaint or the proposed fourth amended complaint, the Supplier Defendants' request serves the interests of judicial economy.

The Court grants motion for leave to file an amended complaint, and the Court considers the proposed fourth amended complaint to be the operative pleading for purposes of the motion for judgment on the pleadings.

### MOTION FOR JUDGMENT ON THE PLEADINGS[1]

#### A.    Legal Standard

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is "ordinarily accorded much the same treatment" as a motion to dismiss for failure to state a claim. *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 54 (1st Cir. 2006). To survive a Rule 12(c) motion, as with a 12(b)(6) motion, "a complaint must contain factual allegations that 'raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true.'" *Perez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 29 (1st Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

---

[1] The Court does not repeat the facts here because this Court's prior order on the Supplier Defendants' motion to dismiss contained a detailed recitation of the factual allegations. (Second Dismissal Order, ECF No. 250.)

The proper time to file a motion for judgment on the pleadings is "[a]fter the pleadings are closed." Fed. R. Civ. P. 12(c). "'[T]he pleadings are closed for the purpose of Rule 12(c) once a complaint and answer have been filed.'" *McGuigan v. Conte*, 629 F. Supp. 2d 76, 80 (D. Mass. 2009) (quoting *Doe v. United States*, 419 F.3d 1058, 1061 (9th Cir. 2005)).

## B.   Rule 12(g) and Requests for Reconsideration

Plaintiffs argue that the Supplier Defendants' motion is prohibited under the raise-or-waive provisions of Rule 12. The argument implicates the interrelated terms of Rule 12(b), (c), (g), and (h).

Rule 12(b) requires a party to raise all defenses in a responsive pleading, but it also permits the assertion of seven enumerated defenses by motion before filing a responsive pleading. Fed. R. Civ. P. 12(b)(1)–(7). A party asserting a Rule 12 motion "must not make another motion under [Rule 12] raising a defense or objection" that it could have raised in the earlier motion, "[e]xcept as provided in Rule 12(h)(2) or (3)," Fed. R. Civ. P. 12(g)(2), and "[a] party waives any defense listed in Rule 12(b)(2)–(5)" by omitting it from a motion as described in Rule 12(g)(2), or by failing to raise it by motion or include it in a responsive pleading, Fed. R. Civ. P. 12(h)(1). Pursuant to Rule 12(h)(2), a party is permitted to raise the defenses of "[f]ailure to state a claim upon which relief can be granted, to join a person required by Rule 19(b), or to state a legal defense to a claim" in one of three ways: (1) "in any pleading allowed or ordered under Rule 7(a);" (2) "by a motion under Rule 12(c)," or (3) "at trial." Fed. R. Civ. P. 12(h)(2). A Rule 12(c) motion allows a party to request

judgment on the pleadings "after the pleadings are closed . . . but early enough not to delay

trial . . . ." Fed. R. Civ. P. 12(c).  As one court explained:

> The consequence of omitting a defense from an earlier motion under Rule 12 depends on [the] type of defense omitted.  A defendant who omits a defense under Rules 12(b)(2)–(5)—lack of personal jurisdiction, improper venue, insufficient process, and insufficient service of process—entirely waives that defense.  A defendant who omits a defense under Rule 12(b)(6)—failure to state a claim upon which relief can be granted—does not waive that defense.  Rule 12(g)(2) provides that a defendant who fails to assert a failure-to-state-a-claim defense in a pre-answer Rule 12 motion cannot assert that defense in a later pre-answer motion under Rule 12(b)(6), but the defense may be asserted in other ways.

*In re Apple iPhone Antitrust Litigation*, 846 F.3d 313, 317–18 (9th Cir. 2017) (citations

omitted).

Plaintiffs' argument fails for at least two reasons.  First, the raise-or-waive rule of

Rule 12(g) and (h) does not apply here because it contains an exception for a post-answer

Rule 12(c) motion raising the failure to state a claim defense (which is reviewed under the

same standard as a pre-answer Rule 12(b)(6) motion).   The Supplier Defendants'

previously filed an answer, then later filed this motion pursuant to Rule 12(c), which

motion raises the alleged failure to state a claim defense, and the Court discerns no reason

that consideration of the motion would be expected to delay trial.[2]  In addition, the raise-

---

[2] The Court also notes that other courts have permitted the discretionary consideration of successive pre-answer Rule 12(b)(6) motions based on the availability of post-answer Rule 12(c) motions, even though the successive motion did not technically fit within the Rule 12(h)(2) and (c) exception.  *See Jones v. Montachusetts Reg'l Transit Auth.*, No. 22-1569, 2023 WL 9233970, at *2 (1st Cir. Nov. 30, 2023) ("[T]he district court did not err in entertaining the [successive] motion to dismiss" because the label of the subsequent motion "made no practical difference because the same standard of review applies to Rule 12(b)(6) and Rule 12(c) motions . . . ."); *Fernau v. Enchante Beauty Prod., Inc.*, 847 F. App'x 612, 620 (11th Cir. 2021) ("[A] district court's decision to consider a successive Rule 12(b)(6) motion to dismiss is usually harmless, even if it technically violates Rule 12(g)(2).  So long as the district court accepts all of the allegations in the complaint as true, the result is the same as if the defendant had filed an answer admitting these allegations and then filed a Rule 12(c) motion for judgment on the pleadings, which Rule

or-waive rule contained in subsections (g) and (h) does not apply here because the Defendants collectively did not omit the special injury issue from their pre-answer motions. Rather, the Supplier Defendants now raise the same legal issue the other defendants litigated before the Supplier Defendants were joined in the case.

The fact that some of the defendants previously raised the same issues and arguments, however, presents a different concern. Because the Court previously considered and rejected the defendants' request to dismiss the public nuisance claim based on the special injury requirement, (First Dismissal Motion at 21, ECF No. 81), the Supplier Defendants' motion is in essence an untimely motion to reconsider the prior order. As one court explained:

> Defendants' motion for judgment on the pleadings addresses matters previously raised in their motion to dismiss, and decided—either explicitly or by necessary implication—in the Court's resolution of that motion. The Court views this motion as an untimely request for reconsideration rather than an independent motion for judgment on the pleadings that raises new issues. While the Court is not barred from reexamining the issues raised in the instant motion, *see* Fed. R. Civ. P. 54(b), the Court sees no reason to do so. Judicial economy would be undermined by allowing parties an unlimited right to revisit issues raised in Rule 12(b)(6) motions via Rule 12(c) motions. Rule 12(g) and Rule 12(h)(2) allow a party to raise a failure to state a claim in a Rule 12(c) motion without having waived the argument by failing to file a motion prior to answering the complaint. They do not provide an unfettered grant to seek reconsideration of arguments already raised and lost in a previous Rule 12(b)(6) motion.

*In re Toyota Motor Corp. Securities Litigation*, No. CV 10-922 DSF AJWX, 2012 WL 3764903, at *1 (C.D. Cal. Feb. 21, 2012).

---

12(h)(2)(B) expressly permits") (internal quotation marks omitted) (quoting *Leyse v. Bank of Am. Nat. Ass'n*, 804 F.3d 316, 321–22 (3d Cir. 2015) and citing *Albers v. Bd. Of Cty. Comm'rs of Jefferson Cty.*, 771 F.3d 697, 703–04 (10th Cir. 2014)).

Given that the granting of a motion for reconsideration is an extraordinary remedy which should be used sparingly "[u]nless the court has misapprehended some material fact or point of law, such a motion is normally not a promising vehicle for revisiting a party's case and rearguing theories previously advanced and rejected." *Palmer v. Champion Mortgage*, 465 F.3d 24, 30 (1st Cir. 2006).  Ordinarily, "[t]o succeed on a motion for reconsideration, the moving party generally must show (1) an intervening change in the controlling law; (2) the need to correct a clear error of law; or (3) newly discovered evidence not available to the court when the order was issued." *SEC v. Commonwealth Equity Services, LLC*, No. 1:19-CV-11655-IT, 2024 WL 758171, at *1 (D. Mass. Feb. 23, 2024).

The only new argument the Supplier Defendants raise is a recent decision of the Maine Business and Consumer Court dismissing a public nuisance claim based on the special injury requirement: *Saunders v. Sappi North America, Inc.*, No. BCD-CIV-2023-00033, 2024 WL 1908964 (Me. B.C.D. Jan. 2, 2024).  Because state trial court decisions represent at most persuasive authority rather than controlling authority, reconsideration is not warranted based on the mere fact that there may be some tension between the Court's prior order and a more recent decision of a state trial court.  *See Sheffer v. US Airways, Inc.*, No. 3:15-CV-00204-RCJ, 2015 WL 4276239, at *3 (D. Nev. July 14, 2015) (finding there was no manifest error because "there is no controlling authority and only very sparse, ambivalent persuasive authority available on the question. . . Nor does a state trial court's ruling qualify as an intervening change in law . . . .").  Furthermore, after considering the Supplier Defendants' arguments anew, and after reviewing the *Saunders* decision, *see infra*

7

Part C, the Court concludes the prior decision denying the request to dismiss the public nuisance claim was not based on an error of law warranting reconsideration.

## C.     The Public Nuisance Claim

### 1.     The Special Injury Element

A public nuisance is an "unreasonable interference with a right common to the general public."  Restatement (Second) of Torts § 821B.  Public officials can pursue legal action to abate a public nuisance, but other persons only have a cause of action if the person has "suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference." Restatement (Second) of Torts § 821C; *see also Brown v. Watson*, 47 Me. 161, 162 (1859) (there is no individual cause of action unless a person "has suffered therefrom some special and peculiar damages other and greater than those sustained by the public generally."). The special damages need not be of great magnitude so long as they result from "injuries" or "pecuniary loss" to the plaintiff's "person or property."  *Charlton v. Town of Oxford*, 2001 ME 104, ¶¶ 27, 31, 774 A.2d 366, 375–76 ("For an injury to a particular person, as by a common nuisance, no matter how inconsiderable the injury, he may maintain an action.") (quoting *Brown*, 47 Me. at 164); *see also Smedberg v. Moxie Dam Co.*, 148 Me. 302, 307, 92 A.2d 606, 608 (1952) ("There must be an infringement of the plaintiff's private rights to permit recovery . . . .").

The effect of the special injury element is that the factual circumstances generating a public nuisance claim actionable by a nonstate actor are often "identical" or "are analogous" to the circumstances generating a cause of action for a private nuisance.

8

Simmons, Zillman, and Furbish, Maine Tort Law § 14.03.[3]  The typical utility in a nonstate actor's public nuisance action is that the relevant interest and interference need not relate to the plaintiff's land and can therefore provide a remedy when one or both parties use the resource but someone else (or no one else) is the owner.  *See, e.g.*, *Burgess v. M/V Tamano*, 370 F. Supp. 247, 250 (D. Me. 1973) ("Since the fishermen and clam diggers have no individual property rights with respect to the waters and marine life allegedly harmed by the oil spill, their right to recover in the present action depends upon whether they may maintain private actions for damages based upon the alleged tortious invasion of public rights which are held by the State of Maine in trust for the common benefit of all the people.").

---

[3] The elements of a common law private nuisance claim are:

> (1) The defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use;
> (2) There was some interference with the use and enjoyment of the land of the kind intended, although the amount and extent of that interference may not have been anticipated or intended;
> (3) The interference that resulted and the physical harm, if any, from that interference proved to be substantial. The substantial interference requirement is to satisfy the need for a showing that the land is reduced in value because of the defendant's conduct;
> (4) The interference that came about under such circumstances was of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land.

*West v. Jewett & Noonan Transportation, Inc.*, 2018 ME 98, ¶ 14, 189 A.3d 277, 281–82 (quotation marks and modification omitted).  The intent element "mean[s] only that 'the defendant has created or continued the condition causing the interference with full knowledge that the harm to the plaintiff's interests are occurring or are substantially certain to follow." *Johnston v. Maine Energy Recovery Co. Partnership*, 2010 ME 52, ¶ 15, 997 A.2d 741, 745 (quoting *Charlton*, 2001 ME 104 ¶ 37 n.11).  A plaintiff can prove substantial interference in several ways, such as (1) an invasion that "affects the physical condition" of the property or involves "more than 'mere physical discomfort or mental annoyance,'" *West*, 2018 ME 98 ¶¶ 15–16, 189 A.3d at 282, (2) overall market value depreciation, (3) a reduced magnitude of appreciation, or (4) repair costs. *Darney v. Dragon Prod. Co.*, LLC, 771 F. Supp. 2d 91, 109 (D. Me. 2011), amended in part, No. 2:08-CV-47-GZS, 2011 WL 2007300 (D. Me. May 23, 2011).

> The reasons usually given for the [special injury] rule are that it is essential to relieve the defendant of the multiplicity of actions that might follow if everyone were free to sue for the common wrong; and that any harm or interference shared by the public at large will normally be, if not entirely theoretical or potential, at least minor, petty and trivial so far as the individual is concerned.

Restatement (Second) of Torts § 821C cmt. a. (1979).

## 2.     The Classic Fact Pattern: Obstructing a Public Way

As the result of line drawing challenges and tension between competing principles governing nonstate actors' public nuisance actions,[4] courts often analogize to a few classic factual scenarios.  *See* (First Dismissal Order at 19 ("A highway obstruction is a classic example that illustrates the point."); *Demmons v. ND OTM LLC*, No. 1:22-CV-00305-NT, 2023 WL 5936671, at *7 (D. Me. Sept. 12, 2023) ("Just what constitutes 'special and peculiar' damages, has proven to be slipperier than an eel in an oil spill . . . . Here, I must apply Maine law, and a brief trip through Maine's public nuisance case law provides the

---

[4] *See, e.g.*, Restatement (Third) of Torts: Liab. for Econ. Harm § 8 (2020) ("What injuries are 'special,' or 'distinct in kind,' is unavoidably a matter of judgment rather than rule."); *Burgess*, 370 F. Supp. at 250 ("Concededly, the line between damages different in kind and those different only in degree from those suffered by the public at large has been difficult to draw").  As the Law Court once summarized:

> It is held that the particular injury is one not merely greater in degree but different in kind. But it has also been held that a private action is not to be defeated by the fact that others suffer a similar particular injury.
>
> The mere fact that a person is delayed or compelled to take a circuitous route by an obstruction in the highway does not necessarily constitute special damages.  But where an individual suffers expensive delay or substantial pecuniary loss in traveling or transporting goods, it may be a particular damage for which he has a right of action.
>
> The reason for the rule which denies an action to an individual for a common nuisance is that it would cause such a multiplicity of suits as to be itself an intolerable nuisance.  But with equal justice it was said [that] "[i]f [people] will multiply injuries, actions must be multiplied too, for every [person] that is injured ought to have [] recompense."

*Smart v. Aroostook Lumber Co.*, 103 Me. 37, 68 A. 527, 532–33 (1907) (citations omitted).

guiding principles required to analyze this case."); *Barnes v. Hathorn*, 54 Me. 124, 126–27 (1866) (for public nuisance claims "it is useful to examine the whole range of authorities, to extract, if possible, the true principles applicable to the subject.").

The obstruction of a public way—such as a highway or navigable water—is a public nuisance because it interferes with the "equal right [of] each citizen to their reasonable use." *Smart v. Aroostook Lumber Co.*, 103 Me. 37, 68 A. 527, 531 (1907).  A plaintiff who does not allege that he or she "attempted to use the passage" and was compelled to make a burdensome detour or "had been put to [a significant] expense" has not suffered an injury different than the general public, *Tuell v. Inhabitants of Marion*, 110 Me. 460, 86 A. 980, 981 (1913); *see also Holmes v. Corthell*, 80 Me. 31, 12 A. 730, 731 (1888), but a plaintiff who attempted to use the obstructed way and actually suffered a significant delay or expense, *Brown*, 47 Me. at 163,[5] or who was reliant on the obstructed portion of the way for "egress and ingress to her premises," can establish a special injury not equivalent to that of the general public, *Cobe v. Banton*, 106 Me. 418, 76 A. 907, 909 (1910); *see also Yates v. Tiffiny*, 126 Me. 128, 136 A. 668, 669 (1927).  As the Law Court observed:

> The mere fact that a person is delayed or compelled to take a circuitous route by an obstruction in the highway does not necessarily constitute special damages . . . [b]ut where an individual suffers expensive delay or substantial

---

[5] Many jurisdictions consider mere delay or inconvenience to be too similar to the kind of harm suffered by the broader public, *see* Restatement (Second) of Torts § 821C cmt. i. (1979) ("The delay or inconvenience suffered by a particular plaintiff, even though it may be greater in degree, is not particular harm of a different kind and will not support an action for the public nuisance."), but Maine law evidently represents a more permissive approach.  There does not appear to be any authority casting doubt on the rule from *Brown v. Watson*.  On the contrary, the case has been cited regularly in recent decades in state courts.  *See, e.g.*, *Charlton*, 2001 ME 104 ¶ 27 ("For an injury to a particular person, as by a common nuisance, no matter how inconsiderable the injury, he may maintain an action.") (quoting *Brown*, 47 Me. At 164); *Drake v. City of Portland and 142 Presumpscot, LLC*, No. AP-04-035, 2005 WL 6750122 (Me. Super. Ct. May 27, 2005) ("The leading Maine decision on the meaning of special damage is *Brown v. Watson*.").

> pecuniary loss in traveling or transporting goods, it may be a particular
> damage for which [the person] has a right of action.

*Smart*, 68 A. at 533 (finding special damages because the "obstruction of the river not only

obstructs [the plaintiff's] right in common with others to pass up and down the river, but

cuts off his right of access to his private property.").

### 3.      Typical Categories of Special Injuries

"An interference with the enjoyment and value of a person's private property rights

is a special injury" for purposes of a nonstate actor's public nuisance action.  58 Am. Jur.

2d Nuisances § 190.  In addition to an obstruction to a public way that blocks access to

private land, courts have found special injuries when a harmful substance spilled into a

public water and from there onto certain plaintiffs' land, *Burgess*, 370 F. Supp. at 249

("[T]he Court holds that the motions to dismiss the claims of . . . the Old Orchard Beach

businessmen . . . who owned shore property physically injured by the spill" must be

denied), and when mine tailings contaminated a river rendering the water unfit for

continued irrigation of a lower riparian user's farmland, *Arizona Copper Co. v. Gillespie*,

230 U.S. 46, 52, 57(1913).  On the other hand, a mere "aesthetic injury" to a landowner

from another user's exercise of the same public right is insufficient.  *Charlton*, 2001 ME

104 ¶ 33 (discussing *Whitmore v. Brown*, 102 Me. 47, 57, 65 A. 516, 520 (1906)).[6]

---

[6] The case of *Smedberg v. Moxie Dam Co.,* 148 Me. 302, 92 A.2d 606 (1952), might be instructive.  In a
public nuisance suit against a dam operator which had allegedly harmed the fishing in the lake by repeatedly
causing the water level to fluctuate from extreme low to extreme high, the Law Court found no special
injury to nearby camp owners who frequently used the lake and rented property to people attracted to the
lake but who did not own shore property.  *Id.* at 309–10 ("Loss in value from damage to the fishing is not
peculiar to the plaintiff. The private camps in the region doubtless are worth less for the same reason. The
guide, the storekeeper, and all business men whose livelihood depends in any part upon the lure of fishing,
suffer no less than the plaintiff. The injury to each is identical in kind.").  The *Smedberg* Court did not

It is also well established that "[w]hen the public nuisance causes personal injury to the plaintiff . . . the harm is normally different in kind from that suffered by other members of the public and the tort action may be maintained."  Restatement (Second) of Torts § 821C cmt. d. (1979); *see also Smart*, 68 A. at 533 ("[A]pplication of the [special injury] principle is obvious . . .where an individual suffers physical injury [or] injury to his horse or carriage."); *Larson v. New England Tel. & Tel. Co.*, 141 Me. 326, 329, 342 44 A.2d 1, 3, 8–9 (1945) (special damages element was satisfied when the defendant temporarily repaired an excavation with gravel, creating a depression in a roadway after a time, and when the plaintiff's "car struck the depression caused by the displaced gravel, the car skidded and overturned.").

In contrast, courts are less likely to find a special harm based only on fear, subjective concerns, or a diffuse risk of harm that does not actually result (or is not reasonably certain to result) in significant physical injury to the individual.  *See Palmer v. Amazon.com, Inc.*, 51 F.4th 491, 513 (2d Cir. 2022) (somewhat increased "generalized risk of contracting COVID-19" was insufficient); *Guttmann v. Nissin Foods (U.S.A.) Co., Inc.*, No. C 15-00567 WHA, 2015 WL 4309427, at *6 (N.D. Cal. July 15, 2015) ("There is no allegation that [Plaintiff] suffered a specific personal injury" as opposed to a mere "increased risk of harm allegedly suffered by all consumers" of food products containing trans fats); *San Francisco Herring Ass'n v. Pac. Gas & Elec. Co.*, No. 14-CV-04393-WHO, 2019 WL

---

imply, however, that the same analysis would necessarily govern if one of the plaintiffs had owned property on the shore of the lake.  *Id.* at 305 (declining to address "what rights, if any, in fishing or a public landing may belong to owners of shore property on our great ponds" because "[t]he plaintiff's hotel and camps are not on the shore.").

11073502, at *4 (N.D. Cal. July 26, 2019) (finding no special injury from allegation that plaintiff was "suffering from heightened anxiety and stress stemming from his fear that he is at increased risk of health problems after living for so long in the vicinity of the alleged contamination."); *Sullivan v. Chief Just. for Admin. & Mgmt. of Trial Ct.*, 448 Mass. 15, 34, 858 N.E.2d 699, 715 (2006) (finding no special injury based on allegation that employees of courthouse who alleged "they have been unduly exposed to asbestos fibers over a long period of time, putting them at higher risk for mesothelioma," but who did not suffer from mesothelioma).[7]

"Pecuniary loss to the plaintiff resulting from the public nuisance is normally a different kind of harm from that suffered by the general public."  Restatement (Second) of Torts § 821C cmt. h. (1979); *Charlton*, 2001 ME 104 at ¶ 31 (finding no special injury in part because there was nothing "to establish that they have suffered any pecuniary loss."). Scenarios in which Maine courts have found pecuniary or economic loss include when someone must incur additional expenses to avoid an obstruction to a public way, *see Tuell v. Inhabitants of Marion*, 110 Me. 460, 86 A. 980, 982 (1913), or when a business loses

_____

[7] The decision in *Foley v. H.F. Farnham Co.*, 135 Me. 29, 188 A. 708 (1936) might also be instructive. When analyzing a public nuisance claim brought by two pedestrians who were walking on a street, stopped to rest at a business entryway, and a large sign above the door fell and injured them, the Law Court acknowledged that "[t]he maintenance on private property of a dangerous menace to public travel" would constitute a public nuisance, and the Law Court hypothesized that "had plaintiffs been walking, or standing near the edge of the street" at the time the sign fell, "the falling sign might have done them damage" and presumably satisfied the special injury requirement to generate a public nuisance claim.  *Id.* at 710.  The Law Court evidently did not find a special injury based on the unrealized risk of physical harm the two plaintiffs experienced when they were "traveler[s] on a public way," and the physical injuries they eventually did suffer were not enough because the injuries did not occur until several minutes after the plaintiffs had left the public way to become trespassers on private property. *Id.* at 711; *see also* Restatement (Second) of Torts § 368 cmt. e.–h. (1965).

significant profits because an obstruction to the public way prevented the business from operating for a prolonged period, *see Dudley v. Kennedy*, 63 Me. 465, 467 (1874), or when an "established business" is based on the "commercial use" of the exercise of the public right impaired by the nuisance.  Restatement (Second) of Torts § 821C cmt. h.; *see also Burgess*, 370 F. Supp. at 250 ("[A] man engaged in commercial fishing or clamming, and dependent thereon for his livelihood" suffered special injury from an oil spill); *Wyman v. United States Surgical Corp.*, No. 1:18-CV-00095-JAW, 2020 WL 1932338, at *50 (D. Me. Apr. 21, 2020) (a lobster and crab fisherman could recover based on public nuisance from mercury pollution of a river if he could establish with evidence "beyond the speculative" that the resulting fishing closures caused business economic losses).

In contrast, it is not enough to show only secondary or attenuated harms to a business further removed from the public right, such as by reduced demand for service industries when fewer people are attracted to use the public resource.  *See Burgess*, 370 F. Supp. at 251 (other "businessmen do not assert any interference with their direct exercise of a public right. They complain only of loss of customers indirectly resulting from alleged pollution of the coastal waters and beaches in which they do not have a property interest. Although in some instances their damage may be greater in degree, the injury of which they complain, which is derivative from that of the public at large, is common to all businesses and residents of the Old Orchard Beach area."); *Smedberg*, 148 Me. At 309–10 ("Loss in value" for a business supporting people drawn to a lake to fish "is not peculiar to the plaintiff.  The private camps in the region doubtless are worth less for the same reason. The guide, the storekeeper, and all business men whose livelihood depends in any part upon the

lure of fishing, suffer no less than the plaintiff."); *Demmons,* 2023 WL 5936671 at *10 ("*Smedburg* and *Burgess* teach that pecuniary loss is sufficient if it flows directly from the violation of the public right, but it will not suffice if it is suffered derivatively or indirectly.").

### 4. Other Pollution Cases

When nonstate actors have brought public nuisance claims based on chemical pollution, courts have applied with different results the three categories of common special injuries discussed above (harm to property, personal injuries, and pecuniary harm). The reasoning of courts in some analogous cases persuades the Court that Plaintiffs have plausibly alleged the requisite special injury.

In *Anderson v. W.R. Grace & Co.*, 628 F. Supp. 1219 (D. Mass. 1986), individuals who had contracted leukemia and other illnesses and family members of those individuals brought public nuisance claims based on the contamination of two public municipal groundwater wells with chemicals, including trichloroethylene and tetrachloroethylene. *Id.* at 1222. Because "[t]he right to be free of contamination to the municipal water supply is clearly a right common to the general public," interference with that right was a public nuisance, and the plaintiffs established a special injury because "injuries to a person's health are by their nature 'special and peculiar' and cannot properly be said to be common or public," and because the plaintiffs plausibly "suffered a variety of illnesses as a result of exposure to the contaminated water." *Id.* at 1233.

Because the defendants had already ceased releasing the pollution and the public groundwater wells had closed before the lawsuit, a claim for expenses for abating the

ongoing nuisance and an injunction for those plaintiffs still living in the municipality were inappropriate remedies because they "would not mitigate" the personal injuries and because "the existing groundwater contamination in [the municipality] and under their property" did not represent an "actual detrimental effect on plaintiffs' use or enjoyment of their land." *Id.* In other words, the plaintiffs "ha[d] not claimed any loss of property value," and the "abstract claim of a threat and invasion by the contaminated groundwater is not the required harm to their use and enjoyment of their property." *Id.* The *Anderson* court noted that the plaintiffs "claim no contact" with the existing groundwater under the town that might still be contaminated, and the plaintiffs had "cited no case in which the mere introduction of foreign material into the ground" constituted a special injury. *Id.*

In *Guidi v. Jordan*, No. CIV.A. CV-01-198, 2003 WL 21384624 (Me. Super. Ct. May 14, 2003), after the number of abandoned vehicles on neighboring land significantly increased, landowners sued for public nuisance against the neighbor who operated an automobile graveyard. *Id.* at *1. Both parcels had frontage on a river and used the same sand and gravel groundwater aquifer. *Id.* The plaintiffs had ceased using their well water, tests of the plaintiffs' soil and well water found glycol from antifreeze and petroleum products like Methyl tert-butyl ether (MTBE) and diesel range organics (DROs), and in the opinion of a real estate broker, the value of the plaintiffs' property was negatively impacted by $21,500. *Id.* The court concluded that the facts established nonspeculative peculiar damages. *Id.* at 2–3 (the plaintiffs had made sufficient showing that the public nuisance "injured the plaintiffs differently than it has the community at large"); *see also Lewis v. Gen. Elec. Co.*, 37 F. Supp. 2d 55, 61 (D. Mass. 1999) (reduced land value or inability to

sell land due to contamination from polychlorinated biphenyls (PCBs) constituted special injury).

Other courts have concluded that a special injury has occurred when a plaintiff reasonably incurs substantial economic costs responding to or mitigating their exposure to the spread of pollution in a public resource. *See Ryan v. Greif, Inc.*, No. 22-CV-40089-MRG, 2023 WL 8828220, at \*15 (D. Mass. Dec. 21, 2023) (individuals who either: (1) owned land within the relevant area which was supplied by a well contaminated with PFAS; or (2) owned land that received compost contaminated with PFAS; "are property owners who have sustained the 'special harm' of needing to decontaminate their properties from PFAS."); *Johnson v. 3M*, 563 F. Supp. 3d 1253 (N.D. Ga. 2021) (finding special harm from having to "pay the added costs of attempting to remove PFAS contamination" from the water supply); *City of Portland v. Boeing Co.*, 179 F. Supp. 2d 1190, 1193, 1200 (D. Or. 2001) (when the plaintiff learned that nearby groundwater had been contaminated with TCE, to prevent the spread into the plaintiff's wells, the plaintiff had to reduce utilization of well field and participate in a joint monitoring program).

### 5.   The First Dismissal Order, *Saunders* and *Hanlin*

In June 2022, in the prior order addressing the original defendants' motion to dismiss, the Court denied the motion as to the public nuisance claim because Plaintiffs alleged special injury involving the "need to decontaminate their properties and water" based on the presence of hazardous levels of PFAS.  (First Dismissal Order at 20–21 (citing *Johnson*, 2021 WL 4745421 at \* 62–63)).  For the reasons discussed herein, this Court finds no error in that conclusion.  When attempting to show an injury that is different from that

18

of the public at large, it is likely insufficient to allege only aesthetic concerns,[8] the shared desire for a clean environment,[9] or a diffuse risk of harm from the ubiquitous exposure through air, water, or food to some concentration of a concerning chemical.[10]  For example, Plaintiffs' alleged "worry and anxiety over their current and future health," (Fourth Amended Complaint ¶ 91), without more, would be difficult to characterize as a harm that is different in kind from the injuries of the public at large from the widespread use of PFAS. Plaintiffs, however, allege much more than that.  Plaintiffs allege invasion of their private property interests in the form of significantly contaminated dust or soil and polluted groundwater wells on their land; diminished property values; and economic losses from the choice of either remediating their soil and wells or face the loss of the use their land and groundwater for agricultural purposes.  The fourth amended complaint, therefore, not only satisfies the special injury requirement based on one form of special injury but arguably satisfies multiple categories of special injuries recognized under Maine law.

Contrary to the Supplier Defendants' contention, the Maine state trial court decision in *Saunders* does not dictate a different conclusion. In *Saunders*, the court dismissed the

---

[8] *See Charlton*, 2001 ME 104, ¶¶ 32–34.

[9] *See Anderson*, 628 F. Supp. at 1233.

[10] For instance, in *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88 (4th Cir. 2011), the court granted summary judgment in favor of the defendant on PFAS pollution claims where the plaintiff claimed that "[m]easurable quantities of PFOA have been detected" in the municipal water supply and that "PFOA also has accumulated in the plaintiffs' blood and has been detected in the homes of other customers." *Id.* at 92. In that case, the plaintiffs could not assert property interference because the case did not involve privately owned wells, and the plaintiffs did not assert substantial pecuniary losses due to necessary remediation efforts.  The case is akin to those discussed above that involve only a broad and unrealized risk of personal injury, as opposed to a concrete injury or disease or some other special injury.

public nuisance claims which were contained in a complaint against PFAS suppliers and which complaint included many allegations similar to Plaintiffs' operative complaint in this case. *Saunders,* 2024 WL 1908964, at *8. The court reasoned that "[c]ertainly, [the p]laintiffs allege that they endured harm to a greater degree than that suffered by the general public, for example by neighboring landowners who have no well installed on their property or whose property is topographically ill-suited for collection of water" but "[the p]laintiffs' alleged injuries are not 'different in kind' than those suffered by the public at large." *Id.*

The *Saunders* court included two bases for its conclusions: (1) it cited *Hanlin Grp., Inc. v. Int'l Minerals & Chemicals Corp.*, 759 F. Supp. 925, 935-36 (D. Me. Sept. 7, 1990), for the proposition that "harm suffered from exposure, loss in property value, or loss of the ability to use and enjoy one's property that resulted from mercury discharged into a waterway were neither special nor peculiar relative to any injury to the general public;" and (2) it noted that "[e]ven if Plaintiffs need to engage in remediation, as they allege, remediation goes to degree, not special injury," meaning that "[a]llowing the claim of public nuisance to turn on remediation would convert every claim of public nuisance into a private nuisance." *Id.* (internal citations omitted). This Court is not persuaded that the *Saunders* reasoning and result should govern here. In the Court's view, such an approach would require on a broad reading of the *Hanlin* decision and would be inconsistent with

the principles distilled from the Law Court's decisions and other persuasive authority discussed above.[11]

In *Hanlin*, the court considered "whether either response costs or loss of enjoyment and use of land alleges a distinct harm suffered in the exercise of a public right" and concluded that the allegations in that case did not satisfy the special injury requirement. *Hanlin*, 759 F. Supp. at 936.  The court also noted that "the special injury requirement would be rendered meaningless if every plaintiff could merely allege injury to the use and enjoyment of its property when such an allegation does not distinguish between injuries distinct from those suffered by the public generally and losses which are derivative of the loss suffered by the public at large." *Id.* at 937 n.15.  Notably, the court's observations were made in the context of a specific set of facts: a landowner's lawsuit for public nuisance against the previous owner of the land the plaintiff had purchased, and although the predecessor had also polluted a public resource, the plaintiff's property was not exposed to chemicals via the public resource, but rather was contaminated by chemicals originating on the very same property. *See id.* at 935 (applying nuisance law to a claim "between vendor and vendee" following the purchase of certain factories).

One of the cases upon which the court in *Hanlin* relied was *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303 (3d Cir. 1985), where the Third Circuit reasoned as follows:

---

[11] Under the reading of *Hanlin* urged by the Supplier Defendants, a plaintiff would likely be unable to establish a special injury in any pollution case, yet courts in this district have recognized such claims both before and after *Hanlin*.  *See Burgess*, 370 F. Supp. at 249 (denying motion to dismiss public nuisance claims of business owners who owned shore property contaminated by oil discharged into waterway); *Demmons*, 2023 WL 5936671 at *10 (finding special injury from release of pollution into air when it impacted private rights as landowners and diminished property value).

> The public right that was interfered with was the right to "pure water". [The plaintiff] does not allege that it used the waters of the Delaware River itself, or that it was directly harmed in any way by the pollution of those waters. If [the plaintiff]—as a riparian landowner—had suffered damage to its land or its operations as a result of the pollution of the Delaware, it would possibly have a claim for public nuisance.  But the condition of the Chester site was not the result of the pollution, it was the cause of it.

*Id.* at 316 (citations omitted).

Because *Hanlin* involved the question of the plaintiff's ability to assert a nuisance claim against the prior owner of the plaintiff's property, the analysis is not directly applicable in this case where the alleged harms flow directly through the public resources. *Hanlin*, therefore, does not alter the persuasiveness of the analyses in the cases discussed in preceding sections of this order.  To the extent that dicta in the First Dismissal Order arguably endorsed a broad reading of *Hanlin*, more recently, acknowledging the circumstances presented in *Hanlin*, the author of the First Dismissal Order declined to adopt the interpretation of *Hanlin* that the Supplier Defendants encourage this Court to adopt:

> [In *Higgins v. Huhtamaki*,] [a]s I laid out the law, I cited *Hanlin* for the proposition that "losses in property value or the right to use and enjoy one's property" are not special injuries.  I should not have spoken so broadly.  Although the court in *Hanlin* found that the plaintiff's claim of diminution of property value and impairment of the right to use its property did not meet the special injury requirement, that conclusion was based on the fact that *Hanlin* did not allege that it was injured while exercising the public right. (citations omitted).

*Demmons*, 2023 WL 5936671 at *10 (finding special injury from impacted private rights and diminished property values because the "path from the Defendant's emissions to the

22

Plaintiff's harm is direct and not derivative" and because the harms occurred "while exercising the public right").[12]

In sum, (1) this Court discerns no basis to reconsider the Court's prior ruling on the request to dismiss Plaintiffs' public nuisance claim and (2) even if this Court were to reconsider the decision and assess the relevant issues, the Court would deny the Supplier Defendants' motion for judgment on the pleadings.

## CONCLUSION

Based on the foregoing analysis, the Court grants Plaintiffs' motion for leave to amend and denies the Supplier Defendants' motion for judgment on the pleadings. Plaintiffs shall file their amended complaint within seven days of the date of this order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 30th day of August, 2024.

---

[12] The relevant statements in the prior order that seemingly relied on a broad reading of *Hanlin* were:

> Examples of harm that are not special injuries are harms suffered from exposure to mercury, or losses in property value or the right to use and enjoy one's property. . . .
>
> Most of the damages that the Plaintiffs have suffered are not atypical. Their contaminated water and the harms that have directly flowed from that (e.g., the health consequences and effects on farming) are common to the general public and differ only in terms of degree. Although the Plaintiffs emphasize the uneven contamination of the well water, that is not a special harm. All area wells are at risk, and the fact that some wells are contaminated more than others (including some that are not contaminated at all) is not a difference in the kind of harm suffered but only in the degree of harm suffered.

(First Dismissal Order at 19–20). This Court does not consider the statements to support Plaintiff's request for dismissal because they were arguably dicta given that the Court denied the motion and did not dismiss any aspect of the claim, and because the Court subsequently adopted a reading of *Hanlin* that is consistent with the principles discussed in the preceding sections of this order.