**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| **LAWRENCE HIGGINS, TROY RENY, JOSHUA HARRIS, CATHERINE HARRINGTON, HARRINGTON, CHRISTINE DEBLOIS, JUDITH POULIN, et al.** | |
| Plaintiffs, | |
| vs. | Civil Action No. 1:21-cv-00369-JCN |
| **HUHTAMAKI, INC., SOLENIS LLC, BASF, AND 3M,** | |
| Defendants. | |

**PLAINTIFFS' FOURTH AMENDED COMPLAINT**

Plaintiffs file this their Fourth Amended Complaint and respectfully plead the following:

**INTRODUCTION**

1.      Huhtamaki owns and operates a paper mill in Waterville, ME (the "Mill"). Huhtamaki knowingly used "forever chemicals" (per- and polyfluoroalkyl substances and their constituents ("PFAS" chemicals)) and then intentionally and recklessly discharged those toxins in a manner that resulted in them being transmitted onto Plaintiffs' land and drinking water at levels more than a million times higher than the recent Health Advisory values established by the Environmental Protection Agency.

2.      Huhtamaki purchased these toxic PFAS chemicals from Defendants 3M, BASF, and Solenis (the "Chemical Companies," more specifically identified below). The Chemical Companies manufactured and sold the toxic PFAS chemicals for profit to Huhtamaki.

3.     The Chemical Companies knew that their PFAS chemicals were toxic. Yet they negligently, recklessly, and/or intentionally failed to warn Huhtamaki of the chemicals' toxic nature. Had they done so, Huhtamaki would have properly disposed of its waste, thereby avoiding any injury to Plaintiffs.

4.     Plaintiffs are landowners whose lands, property and water supplies were contaminated by Huhtamaki's intentional discharge, distribution, disposal, and/or spreading of these PFAS toxins that were byproducts of the toxic PFAS chemicals manufactured and sold by the Chemical Companies. Plaintiffs have been exposed to and consumed these PFAS toxins through their contaminated water and from food produced from their contaminated lands. Plaintiffs have sustained damage to their real and personal property as well as economic damages as a result of the wrongful conduct of Defendant.

## PARTIES

### Original Plaintiffs

5.     Plaintiff Lawrence Higgins is a citizen of Maine and is an owner of contaminated property in Maine.

6.     Plaintiff Troy Reny is a citizen of Maine and is an owner of contaminated property in Maine..

7.     Plaintiff Joshua Harris is a citizen of Maine and is an owner of contaminated property in Maine.

8.     Plaintiff Catherine Harrington is a citizen of Maine and is an owner of contaminated property in Maine.

9.     Plaintiff Christine Deblois is a citizen of Maine and is an owner of contaminated property in Maine.

10.    Plaintiff Judith Poulin is a citizen of Maine and is an owner of contaminated property in Maine.

## Plaintiffs Added by This Amendment

The following Plaintiffs are being added to this case:

> Judith Ablair, James Auclair, Mary Balboa, Arthur Goodwin, Daniel Beaulieu, David Bellefleur, Alden Bickford, Melissa Boissonneault, Chantel Brochu, Sharon Butler, Jeffrey Caron, Pamela Clark, Shanleigh Collins, Jeri-Lee Cookson, Daniel Curtis, Janet Dawes, Paul Deagle, Michael DeRoche, Kenneth Ellis, Matthew DiFilippo, Vicki Dyer, Lawrence Emery, Tyler Emery, Rosalie Fagan, Roland Fuller, Alison Gagliardi, Ryan Gagne, Marion Garbe, Patricia George, Mary Getchell, Susan Gilman, Phil Gittersberger, Ashley Gooden, Simone Goodspeed, Forrest Goodwin, Brendon Gorrie, Budd Grant, Jane Greenblatt, Deborah Greene, Sharon Greene, Daniel Grudda, William Grudda, Wilfred Guertin, Cheryl Gullifer, Robin Harrington, Joshua Luke Harris, Timothy Higgins, Theresa Hiltz, William Holland, Marc Hutchison, Valarie Ireland, Dorothy Lane, Donna Lee, Charles Mackay, Corrie Marinaro, Nadene Mathes, Kimberly McLain, Douglas Miller, Judith Mosher, Deborah Mullen, Dale Musolf, John Noel, Michael Otis, Gene Paquet, Gary Parsons, Jeffrey Pellerin, Peggy Pellerin, Erik Perkins, Daniel Poulin, Tori Richards, Ethan Robertson, Lisa Robles, Kelly Sue Rogers, Cory Roy, Patricia Shuck, Bryan Slaney, Patrick Slaney, Edward Stevens, Jr., Matthew Stone, George Taylor, Erwin Taylor, Jr., Cole Teague, Sherry Tompkins, Frank W. Tozier, Sr., Marilyn Tozier, Stephen N. Tozier, Sr., Brian Wadleigh, Jody West, Susan White, Thomas Wick, the Sebasticook Regional Land Trust and Sunset Greenhouses, Inc.

Each of these plaintiffs is a resident of Maine and owns property that was polluted with PFAS as a result of Defendants wrongful conduct within this Federal Judicial District in Maine.  Hereinafter, "Plaintiffs" is used collectively to refer to each/all plaintiffs.

## Paper Mill Defendant

11.    Defendant Huhtamaki, Inc. ("Huhtamaki") is a corporation organized under the laws of, and existing in, the state of Kansas, with its principal place of business located at 9201 Packaging Drive, De Soto, Kansas 66018. Huhtamaki has entered an appearance in this action.

**Chemical Company Defendants**

12. Defendant Solenis LLC ("Solenis"), formerly known as Ashland Hercules Water Technology is limited liability company. Upon information and belief Solenis is owned 100% by Solenis Holdings 1 LLC. Solenis Holdings 1, LLC is a Delaware LLC whose sole member is Solenis Holdings, LLC. Solenis Holdings, LLC is a Delaware LLC wholly owned by Olympus Water US Holding Corporation which is incorporated in Delaware with its principal place of business in California. Solenis has agreed to waive service and enter an answer in this action; thereby replacing Solinis Interntational LLC as a defendant in this case.

13. Defendant BASF is a corporation organized under the laws of, and existing in, the State of New Jersey, with its principal place of business located at 100 Park Ave, Florham Park, New Jersey 07932. BASF has entered an appearance in this action. BASF acquired Ciba in approximately 2008 and became successor-in-interest to Ciba at that point. Plaintiffs allege on information and belief that BASF assumed liability for, among other things, Ciba's liability for damages caused by or related to products that Ciba had previously sold.

14. Defendant 3M is a corporation organized under the laws of, and existing in, the State of Minnesota, with its principal place of business located at 2501 Hudson Road, Maplewood, Minnesota 55144. Defendant 3M has entered an appearance in this action.

15. 3M, BASF, and Solenis, are collectively referred to as the "Chemical Companies." The Chemical Companies and Huhtamaki are collectively referred to as "Defendants."

**JURISDICTION AND VENUE**

16. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

17. All Plaintiffs are citizens of Maine.

18.     No Defendant is a citizen of Maine.

19.     Each Plaintiff's damages is far in excess of $75,000.

20.     Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district and all of the properties that are the subject of this action are in this district.

21.     This Court has jurisdiction over the parties because the Defendants resided, transacted business, were found, and/or had agents in the State of Maine, and because a substantial part of the events giving rise to Plaintiffs' claims occurred in the State of Maine.

22.     Defendants have systematically transacted and conducted business in the State of Maine, and these causes of action arise, in part, from the same.

23.     At all relevant times, Defendants expected or should have expected that their acts would have consequences within the United States of America and the State of Maine.

24.     At all relevant times, Defendants derived, and some continue to derive, substantial revenue from their financial activities in the State of Maine including, but not limited to, the operation of the Mill, and/or the sale and distribution of PFAS containing chemicals, including those at issue in this case, in the State of Maine.

25.     On information and belief, at all relevant times, Defendants committed tortious acts within the State of Maine causing injury within the State of Maine, out of which acts these causes of action arise.

## FACTUAL ALLEGATIONS

### *Chemical Characteristics of PFAS Chemicals*

26.     PFAS chemicals are wholly synthetic chemicals that do not exist in nature. They are known to be harmful to human health, animal health, and the environment at the quantities to which Plaintiffs and their lands have been exposed.

27.     PFAS chemicals have unique properties that make them persistent, bio-accumulative, and toxic.

28.     PFAS chemicals can persist in the environment indefinitely due to the strength of multiple carbon-fluorine bonds. In other words, they break down very slowly in the environment, if at all, earning them the nickname "forever chemicals."

29.     Indeed, PFAS chemicals are thermally, chemically, and biologically stable, and therefore resistant to biodegradation, atmospheric photooxidation, direct photolysis, and hydrolysis.[1]

30.     PFAS chemicals are also water-soluble, making them mobile in groundwater and the environment. Further, because PFAS chemicals repel organic materials, they readily leach through soil, impacting groundwater.

31.     Historically, water treatment systems did not test and/or filter PFAS Chemicals from their water supply.[2]

---

[1] Plaintiffs allege that the Chemical Companies have designed, manufactured, produced, and/or marketed and sold products that contain these chemicals. Plaintiffs further allege that the Chemical Companies sold specific products to Huhtamaki, as identified in this complaint. While there are many chemicals in the PFAS family and many products into which PFAS chemicals are incorporated, the claims alleged in this cause are those that arise out of the Chemical Companies' sale of PFAS containing products that they designed, manufactured, produced, and/or marketed to Huhtamaki, and which Huhtamaki used in its manufacturing processes in its mill after purchase. Even after use in a manufacturing process -- like those employed by Huhtamaki-- the PFAS chemicals in manufacturing byproducts remain in substantially the same condition as they were before being used in the manufacturing process and certainly without change to the essential features of those chemicals. That is, any change in the PFAS products sold by the Chemical Companies through the processes used by Huhtamaki is not a significant change in the product because it does not alter the essential, toxic features of the PFAS chemicals.

[2] Just under half (49%) of Maine's citizens are served water by Community Water Systems, which are regulated under the federal safe Drinking Water Act administered through Maine CDC's Drinking Water Program (DWP) – the remaining 51% obtain their drinking water from residential wells that are not subject to federal or state regulation or testing requirements. Tipton, Meredith, *Managing PFAS in Maine – Final Report from the Maine PFAS Task Force* § (2020).

32.     Similarly, chlorine and other disinfectants that are typically added to drinking water systems did not and do not remove PFAS chemicals from contaminated water.

33.     Compounding the fact that PFAS chemicals are notoriously difficult to remove from contaminated water supplies and soils, toxicology studies have shown that PFAS chemicals are readily absorbed after oral exposure and accumulate primarily in the serum, kidney, and liver.

34.     What is more, PFAS chemicals have a half-life within the human body of up to nine years, and the chemicals are known to cross the placenta from mother to fetus and can be passed to infants through breast milk.

35.     PFAS chemicals are categorized by the medical and scientific communities as "endocrine disruptors," meaning they interfere with the normal functioning of the endocrine system and the reproductive and other biological processes regulated by it.

36.     PFAS chemicals are also known to be immunotoxic, meaning they have an adverse effect on the body's immune system.

37.     These Characteristics contribute to numerous health risks associated with exposure to PFAS chemicals. PFAS chemicals have been linked to physical injuries, diseases, and disorders including, but not limited to: cancer, thyroid disease, high cholesterol, ulcerative colitis, gestational hypertension, kidney disease, hypertension, obesity, and preeclampsia, as well as reduced immunological functions including decreased responsiveness to vaccines. PFAS chemical injuries can have a high latency period meaning injuries can manifest years after exposure to the chemicals.

38.     Increased ingestion of PFAS chemicals affects the body's ability to appropriately respond to vaccines and to fight off infection, among other things. Medical studies have shown a significant reduction in the efficacy of vaccines in patients with

significant PFAS blood levels. Most recently, studies have shown that significant PFAS Chemical exposure more than doubles the risk of contracting COVID, and of having severe disease when infected. Significant ingestion of PFAS chemicals also increases, by more than five-fold, the risk of intensive care or death from COVID disease.

39.     As a result of these serious adverse health consequences of the ingestion of PFAS chemicals, the State of Maine enacted legislation on June 21, 2021 requiring all community water systems to monitor for the PFAS compounds listed by the United States Environmental Protection Agency and to mitigate and continue to monitor any well with combined PFAS levels above 20 nanograms per liter (i.e. 20 parts per trillion (PPT)) before December 31, 2022.

40.     Exactly a year later, on June 21, 2022, the United States Environmental Protection Agency published Health Advisories for four of the most common PFAS agents which include PFOS and PFOA. The EPA established the levels "below which adverse health effects are not anticipated to occur" at .004 PPT for PFOA, and .02 PPT for PFOS.[3] These levels are so low they are below the level of detection for most, if not all, laboratories.

*Huhtamaki's Negligent and/or Reckless Conduct*

41.     Huhtamaki currently owns and operates the Mill which, for decades, has utilized hazardous PFAS chemicals in producing some, if not all, of its molded paper products. The Huhtamaki Mill is located at 242 College Avenue in Waterville, Maine.

42.     The Mill was, owned, and operated by Keyes Fibre Company from 1903 to 1927 when the company was purchased by Rex Pulp Products Company. Thereafter, Rex Pulp Products Company changed its name to Keyes Fibre Company.

---

[3] Federal Register, Volume 87, No. 118, June 21, 2022

43. Arcata National Corp. ("ANC") and Keyes Fibre Company merged in 1979 with the surviving company being Keyes Fibre Company.

44. Keyes Fibre Company was acquired by Huhtamaki in 1999.

45. Huhtamaki, Inc., at all relevant times, produced paper products using and disposing of PFAS chemicals as part of its operation in essentially the same manner as the previous operators of the Mill back to at least 1980.

46. As a result of Huhtamaki's activities, including its negligent and/or reckless disposal of PFAS-contaminated byproducts of their operations at the Mill, and the sale of unreasonably dangerous PFAS chemicals to Huhtamaki by the Chemical Companies, Plaintiffs and their property have been injured by egregiously high and patently dangerous levels of PFAS.

47. The following PFAS containing chemicals, manufactured and sold to Huhtamaki by the Chemical Companies, used by Huhtamaki and recklessly disposed of by Huhtamaki at the Mill: FC-807 a/k/a Scotchban (3M), Lodyne P-201 (Ciba/BASF), Lodyne 2020 (Ciba/BASF),[4] ImPress FP-100 (Solenis), ImPress FP-200 (Solenis), and ImPress FP-200 Ultra (Solenis) (hereinafter referred to as "PFAS Chemicals"). These chemicals possess the same properties as noted in Paragraphs 27-41. Plaintiffs reserve the right to identify additional products that may be identified during discovery as having been sold by the Chemical Companies and used by Huhtamaki in the manner alleged in this amended complaint.

48. Each of these products contain a PFAS compound, or compounds, as their primary ingredient; the ingredient provides the grease and/or water resistance for which the products were used. While some of the products contain other chemical compounds,

---

[4] As alleged in paragraph 14, Defendant BASF is alleged herein to be the successor-in-interest to Ciba, which designed, manufactured, marketed, and sold the Lodyne P-201 and Lodyne 2020 products.

all future reference to "PFAS Chemicals" will be referring only to these primary PFAS ingredients contained within them. Each of these PFAS Chemicals possess the characteristics noted above.

### Huhtamaki's Negligent/Reckless Disposal of PFAS

49.     PFAS Chemicals have been used in the production of certain paper and cardboard packaging since the 1950s. The PFAS Chemicals were used by Huhtamaki at the Mill during its manufacturing of molded fiber products. The PFAS Chemicals were used to prevent the paper material from soaking up fats and water. Huhtamaki may have also used PFAS containing products in printing inks and as moisture barriers.

50.     The processes utilized by the Huhtamaki in manufacturing its molded fiber products created residuals and/or byproducts that had high levels of the PFAS Chemicals. That is, the PFAS chemicals remain molecularly unaltered in the byproducts and residuals of the manufacturing process. These residuals and/or byproducts mainly took the form of wastewater or sludge.

51.     Huhtamaki disposed of these byproducts by combinations of: discharge into the local sewer; spreading; and/or discharge as surface water. As a result of its negligence, much of Huhtamaki's waste ultimately became comingled with biosolids and/or sludge and spread on, or in close proximity, to Plaintiffs' properties.

52.     Because of the nature of the PFAS Chemicals (see Paragraphs 27-41 above) the PFAS Chemicals in the products designed, manufactured, produced, marketed, or sold by the Chemical Companies were not altered in the manufacturing process and remained in the same dangerous form as they were when created and when delivered to Huhtamaki.

53.     Once deposited on the ground or otherwise discharged into sewers or as surface waters, PFAS Chemicals are all but certain to migrate through the soil to ground

water and aquifers and through runoff to nearby lands and waterways. Their path of contamination is difficult to prospectively predict.

54. That is precisely what happed to the PFAS Chemicals used and negligently/recklessly disposed of by Huhtamaki.

55. Plaintiffs have been directly and disproportionately impacted by Huhtamaki' disposal of PFAS waste and/or PFAS-contaminated byproducts. Huhtamaki disposed of PFAS-containing residuals and/or byproducts through one or more of the following: discharge into wastewater treatment facilities; spreading; or discharge as surface water. The disposal of these PFAS-containing residuals and/or byproducts resulted in those residuals and/or byproducts becoming comingled with biosolids and/or sludge and spread on fields near Plaintiffs' homes. These PFAS-containing residuals and/or byproducts contained the very PFAS chemicals that were designed, manufactured, produced, marketed by the Chemical Companies and sold by them to Huhtamaki.

56. It is reported that Huhtamaki is the single largest contributor to the Kennebec Sanitary Treatment District ("KSTD") plant. Huhtamaki's waste stream into that plant was contaminated with high levels of PFAS Chemicals. Those PFAS Chemicals became comingled with KSTD's sludge and/or biosolids which also acted to transport them to fields adjacent to Plaintiffs' property. The PFAS-containing waste discharged from Huhtamaki's mill contained the very PFAS chemicals that were designed, manufactured, produced, marketed by the Chemical Companies and sold by them to Huhtamaki.

57. Huhtamaki knew or should have known that its PFAS contaminated waste would pollute properties, like those owned by Plaintiffs, when disposed of in this manner.

58.     After disposal by the Huhtamaki, the PFAS Chemicals in their residuals and/or byproducts leached into the ground water and aquifers and moved along surface waters, reaching Plaintiffs' land. There, the PFAS Chemicals used and disposed of by Huhtamaki poisoned Plaintiffs' wells, land, plants, and animals.  The PFAS containing products designed, manufactured, produced, and/or marketed by the Chemical Companies and sold by them to Huhtamaki included the same PFAS chemicals and degradations thereof that were detected in Plaintiffs' wells.   Huhtamaki's toxic byproducts also included those PFAS chemicals.

59.     On March 6, 2019, Governor Mills issued Executive Order 5FY 19/20 in which she acknowledged that, "PFAS chemicals that are not naturally occurring, are stable and persistent in the environment, bioaccumulate, toxic at low concentrations, and easily transferred to groundwater …" and established the Governor's Task Force on the Threats of PFAS Contamination to Public Health and the Environment to study the problem and explore solutions.

***Plaintiffs' Exposure to Excessive PFAS Contamination***

60.     Plaintiffs have each been subjected to significantly increased exposure to PFAS Chemicals, beyond that which would be expected (or hoped) for the average person living in this, or any other, State.

61.     Each of Plaintiffs' wells and/or soils have been tested by competent laboratories, and this testing showed that each of their wells and/or properties was contaminated with PFAS Chemicals at levels above those considered safe.  In fact, some Plaintiffs' wells contained over a million times the level considered safe by the EPA. Representative test results from Plaintiff's wells are collectively attached hereto as Exhibit "A."  All test results will be provided to Defendants pursuant to agreed discovery.

62.     Most Plaintiffs drank, cooked with, bathed in, and used this dangerously contaminated water on their lawns and gardens and as drinking water for their animals. Other Plaintiffs also grew crops and/or raised livestock on their PFAS contaminated land. As a result, Plaintiffs have been exposed to and consumed PFAS Chemicals through each of those modes of exposure.  Through that exposure -- including ingestion of PFAS Chemicals -- Plaintiffs have all had their blood, tissue, and organs contaminated with these toxins.

63.     The PFAS contamination has damaged Plaintiffs properties and has resulted in significant economic loss for some Plaintiffs.

64.     The PFAS-containing products designed, manufactured, produced, and/or marketed by the Chemical Companies and sold by them to Huhtamaki included the same PFAS chemicals, or degradations thereof, that were detected in Plaintiffs' wells. Huhtamaki's toxic byproducts also included those PFAS chemicals.  Defendants' toxic PFAS Chemicals have also contaminated Plaintiffs' soil and homes through water, dust, and steam.  Plaintiffs will continue to be exposed to these dangerous chemicals until their homes, properties and wells are fully remediated.

65.     The knowledge that Plaintiffs have, for years, consumed water contaminated with orders of magnitude more PFAS toxins that determined to be safe by the State of Maine and the EPA has resulted in Plaintiffs suffering worry and anxiety over their current and future health, and the health of their children and grandchildren.

66.     Not all residents of Fairfield or the surrounding towns were impacted by Defendants' conduct.  After learning particularly of the contaminated sludge/biosolids that had been used as fertilizer on farms near Plaintiffs' homes, the DEP conducted testing of water wells that may have been affected.  The following map from the DEP website shows the random nature of affected wells:



67.     All the Plaintiffs' homes are "red dots" on this map.  Many of the green dots represent wells that tested below the level of detection, or "non-detect".  As shown, properties with contaminated wells are found, in many cases, to be adjacent to uncontaminated properties.  There are also many wells in the area that were not tested because DEP had no reason to believe they were contaminated.

68.     All of the facts alleged above occurred within this District.

*The Sale of PFAS to Huhtamaki*

69.     Plaintiffs' allegations as to the Chemical Companies identified herein are limited to PFAS containing products that they sold to Huhtamaki.   Where possible, Plaintiffs have identified particular products that were designed, manufactured, produced, and/or marketed by the Chemical Companies and sold by them to Huhtamaki.   But even where that type of specific identification is not yet possible, the claims alleged herein involve only products that the manufacturing defendants sold to Huhtamaki.  Those strictures limit the scope of the allegations geographically to only products that were sold to Huhtamaki and from which PFAS-containing byproducts were discharged, released, or spread.  Finally, the fact that the claims depend upon the sales by the Chemical Companies of those products to Huhtamaki necessarily confines the claims temporally to the periods of time during which the Chemical Companies were selling their PFAS-containing products to Huhtamaki.   On information and belief, Plaintiffs allege that the Chemical Companies named herein held the overwhelming majority -- if not the entirety -- of the market share for selling PFAS-containing products to Huhtamaki.

70.     Solenis sold its PFAS Chemicals -- including ImPress FP-100, ImPress FP-200, and ImPress FP-200 Ultra -- to Huhtamaki Mill, knowing the toxic chemicals would be used in the manufacturing of paper products and would generate toxic waste containing its PFAS Chemicals.

71.     BASF, formerly known as Ciba Inc., sold its PFAS Chemicals -- including Lodyne P-201 and Lodyne 2020[5] -- to Huhtamaki, knowing the toxic chemical would be

---

[5]   As alleged in paragraph 14, Defendant BASF is alleged herein to be the successor-in-interest to Ciba, which designed, manufactured, marketed, and sold the Lodyne P-201 and Lodyne 2020 products.

used in the manufacturing of paper products and would generate toxic waste containing its PFAS Chemicals.

72.     3M sold its PFAS chemicals -- including FC-807 a/k/a Scotchban -- to Huhtamaki, knowing the toxic chemicals would be used in the manufacturing of paper products and would generate toxic waste containing its PFAS Chemicals.

***Plaintiffs' Exposure to Excessive PFAS Chemicals***

73.     The Chemical Companies knew or should have known that the PFAS Chemicals they were selling to the Huhtamaki were highly toxic to humans and to the environment even at very low concentrations. The Chemical Companies further knew or should have known that the uses of their PFAS chemicals by Huhtamaki would result in residuals and byproducts in which those PFAS chemicals would persist. The Chemical Companies also knew or should have known that the persistence of those PFAS chemicals would make those residuals and byproducts unreasonably dangerous to anyone exposed to those residuals and byproducts and the chemicals within them. The Chemical Companies, accordingly, had a duty to warn Huhtamaki of these dangerous qualities of PFAS chemicals and to warn them against undertaking disposal practices that would endanger others (including Plaintiffs) with exposure to the highly toxic, unreasonably dangerous PFAS chemicals persisting in those residuals and byproducts. Despite their duty to warn the Huhtamaki of the hazardous nature of these products the Chemical Companies either negligently or intentionally failed to warn the Huhtamaki of their products' characteristics. Pleading in the alternative: Had the Chemical Companies adequately warned Huhtamaki of the risks of improperly disposing of PFAS contaminated waste, then Huhtamaki would have property disposed of its PFAS contaminated waste thereby avoiding injury to Plaintiffs.

74.     3M pioneered the manufacture of PFAS chemicals with the development of PFOA starting in the early 1950s.

75.     3M sold FC-807, a PFOA product, to Huhtamaki.

76.     3M is the only company to manufacture a PFOA product.  Therefore, the dangerous levels of PFOA in Plaintiffs' wells came from a 3M product – FC-807 is the only one of those products that has been identified by Huhtamaki as having been used at the Mill.

77.     3M conducted studies in the 1950s and early 1960s that showed its PFOS accumulate in the human body and are toxic.  By the 1970s additional 3M studies revealed that is PFOS products were "even more toxic" than previously believed.

78.     In 1999 a 3M scientist resigned in protest saying that he could "no longer participate" in a 3M process that put "markets, legal defensibility and image over environmental safety" while calling PFAS one of the most insidious chemicals in existence.

79.     In an attempt to hide the dangers of PFAS products, 3M breached its legal obligation to report its knowledge of adverse health effects.  It was eventually fined $1.5 million by the EPA for this conduct.

80.     The other Chemical Companies had similar knowledge and information about the dangers of their PFAS Chemicals prior to selling them to Huhtamaki.  Each of the Chemical Companies negligently and/or intentionally failed and refused to warn Huhtamaki about the hazardous nature of their PFAS Chemicals.

81.     The Chemical Companies were not only aware of the uses to which Huhtamaki would (and did) put their PFAS Chemicals, but also actively participated in directing and advising Huhtamaki of how to use and dispose of those PFAS Chemicals.

82.     The Chemical Companies were well versed in Huhtamaki's manufacturing process and knew that its manufacturing process would generate wasted laden with their PFAS Chemicals, unchanged from the structure in which they were delivered to Huhtamaki.

83.     Despite knowing the use of their PFAS Chemicals by Huhtamaki would result in waste highly contaminated with their toxic PFAS Products, the Chemical Companies knowingly and intentionally failed to warn Huhtamaki of the hazardous nature of its waste, necessarily laden with Chemical Companies' PFAS Chemicals because Chemical Companies feared it would hurt sales and reduce their profits.

84.     The Chemical Companies knew that without adequate warning, Huhtamaki would discharge this waste into the local sanitary sewer, into the waterways, or on the ground, and that being uncontained the PFAS-containing waste would contaminate the environment, aquifers, and drinking water.

85.     As a result of the Chemical Companies' knowingly selling their unreasonably dangerous, toxic PFAS Chemicals to Huhtamaki without warning it of the hazardous nature of the chemicals, Huhtamaki disposed of its waste contaminated with high levels of the Chemical Companies' PFAS Chemicals in a manner that resulted in it contaminating Plaintiffs' water, bodies, lands, animals, and residences.

86.     Had the Chemical Companies adequately warned Huhtamaki of the toxic nature of their PFAS Chemicals, Huhtamaki would have properly disposed of its waste contaminated with Chemical Companies' PFAS Chemicals in a safe and prudent manner that would have prevented the PFAS Chemicals from ever reaching Plaintiffs' properties.

87.     As a result of the Chemical Companies negligent, reckless, and/or intentional conduct, Plaintiffs have each been, and will continue to be, subjected to

significantly increased PFAS exposure, beyond that which would be expected (or hoped) for the average person living in this state.

88. Each of Plaintiffs' wells and/or property has been test by a qualified laboratory and this testing shows that each of their wells and/or properties is contaminated with PFAS Chemicals at unsafe levels.

89. The Chemical Companies' toxic PFAS Chemicals have also contaminated Plaintiffs' soil and homes through water, dust, and steam. Plaintiffs will continue to be exposed to these dangerous chemicals until their homes, properties and wells are fully remediated.

90. The contamination has caused loss of enjoyment of Plaintiffs' property, including but not limited to the loss of ability to grow gardens, eat eggs and meats raised on the properties and to allow children to play in the dirt on the property.

91. The knowledge that Plaintiffs have, for years, consumed water contaminated with orders of magnitude more PFAS toxins that determined to be safe has resulted in Plaintiffs suffering worry and anxiety over their current and future health, and the health of their children and grandchildren.

92. The Chemical Companies' toxic PFAS Chemicals have also contaminated Plaintiffs' soil and homes through water, dust, and steam. Plaintiffs will continue to be exposed to these dangerous chemicals until their homes, properties and wells are fully remediated. Additionally, many Plaintiffs will continue to suffer economic loss and loss of profits from their lands until the lands are completely remediated.

## CAUSES OF ACTION AGAINST HUHTAMAKI
### COUNT I
### NEGLIGENCE

93. Plaintiffs repeat, reallege, and incorporate by reference all allegations of this Complaint as if set forth more particularly at length here.

94. Huhtamaki owed Plaintiffs a duty to use, emit, discharge, dispose, and/or distribute their PFAS-contaminated byproducts in a manner which would not cause Plaintiffs injury or harm.

95. Huhtamaki, through its PFAS use and disposal activities alleged herein, failed to act in the matter of an ordinary, careful person or business.

96. Plaintiffs were foreseeable victims located within the scope of the risk created by the Huhtamaki' conduct.

97. Huhtamaki owed Plaintiffs a duty of reasonable care commensurate with the risk of using, emitting, discharging, disposing, and distributing their PFAS contaminated byproducts.

98. As a manufacturer, distributor, supplier, disposer, and/or seller of byproducts containing PFAS -- including waste sludge fertilizers or soil enhancers (or other similar biosolids), discharged wastewater, discharged surface water, and landfill waste -- Huhtamaki knew or should have known of the extraordinary risks posed by toxic contamination with PFAS.

99. Huhtamaki negligently breached its duty of care to Plaintiffs by using, emitting, discharging, disposing, distributing, spreading, and/or spraying PFAS-contaminated materials, by failing to take steps to minimize or eliminate the release of PFAS after those uses, by failing to utilize alternative procedures that would not result in the release of PFAS into the environment and thereafter onto Plaintiffs' land, water supplies and wells, and by using, emitting, discharging, disposing, distributing and/or spraying PFAS on to, or nearby, Plaintiffs' land.

100. Huhtamaki had a duty to investigate the extent to which PFAS contaminated materials used, emitted, discharged, disposed, distributed, spread, and/or

sprayed was likely contaminating property at levels to materially increase nearby residents' likelihood and risk of developing cancer and other diseases.

101.     Huhtamaki negligently breached its duties by, among other things:

a.     Emitting dangerous amounts of PFAS into the water and/or wastewater system.

b.     Selling, distributing, spreading and/or spraying PFAS-containing biosolids and/or sludge, including distribution, spreading, and spraying those biosolids and/or sludge to properties near or neighboring Plaintiffs' or selling those biosolids and/or sludge to others for those uses.

c.     Failing to employ safe methods to adequately control or eliminate PFAS contamination of Plaintiffs, their properties, and their drinking water.

d.     Failing to use alternative procedures which would not result in the discharge of PFAS chemicals into the environment and/or onto Plaintiffs' property.

e.     Failing to locate their PFAS-contaminated byproducts to areas that would avoid damaging property such as Plaintiffs; and

f.     Failing to warn Plaintiffs that they were being exposed to PFAS and failing to warn Plaintiffs of the consequent risks of disease the residents acquired because of that exposure.

102.     As a direct and proximate result of Huhtamaki's use, emission, discharge, disposal, distribution, spreading and/or spraying of PFAS-contaminated   biosolids and/or sludge, Plaintiffs presently suffer, and will continue (in reasonable probability) to suffer in the future: real property damage; out-of-pocket expenses; lost profits,

personal property damage; loss of use and enjoyment of property; diminution in property value; among other injuries.

## COUNT II
## NUISANCE

103.    Plaintiffs repeat, reallege, and incorporate by reference all allegations of this Complaint as if set forth more particularly at length here.

104.    It is axiomatic that Plaintiffs, like all Mainers, have a right to clean land and water.  As Mainers, Plaintiffs have a common right to enjoy their real property free of dangerous contamination and to live their lives without unreasonable exposure to toxic chemicals.

105.    At all times relevant hereto, Huhtamaki knew or should have known that PFAS chemicals are hazardous and harmful to real property, animals, and human beings. At all relevant times, it was substantially certain that Huhtamaki's use, emission, discharge, disposal, distribution, spreading, and/or spraying of PFAS-contaminated materials would cause injury to both land and water (both ground and surface) wherever it ended up in the environment.

106.    Huhtamaki, through the negligent, reckless, and/or intentional acts and omissions alleged herein, caused PFAS chemicals to contaminate Plaintiffs' land, water, property and/or person.

107.    The contamination of Plaintiffs' real and personal property with PFAS toxins has interfered with the rights of Plaintiffs to use and enjoy their property, causing them to suffer damages while sparing others in the community harm.  Indeed, this interference is substantial in nature. It has caused and is causing Plaintiffs to, among other things, refrain from: commercializing their properties, using their contaminated soil to grow crops, raise livestock, grow gardens, to refrain from using contaminated water to

drink, cook, irrigate their gardens, eat from their gardens, or water their pets and livestock. The return of Plaintiffs' rights to full enjoyment of their lands will not be reinstated until their real and personal properties are full remediated of the PFAS contamination.

108.     Huhtamaki's conduct has also substantially interfered with Plaintiffs' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Plaintiff so chooses.  It has reduced the value of their land.

109.     Huhtamaki's negligent, reckless and/or intentional acts and omissions were unreasonable and constitute invasion of the property rights of Plaintiffs.

110.     Plaintiffs, unlike the public generally, have suffered specific injuries because of Huhtamaki's tortious conduct.  As demonstrated by the DEP test results, many private water wells have not been contaminated, and most have not been tested because there is no reason to believe they are contaminated.

111.     Huhtamaki's use, emission, discharge, disposal, distribution, spreading and/or spraying of PFAS-contaminated materials and the contamination of Plaintiffs' property resulting therefrom constitutes both a public and a private nuisance.  This nuisance has caused Plaintiffs to presently suffer, and will cause such suffering in the future, real property damage, out of pocket expense (including expenses to remove and/or remediate the contamination of their properties), personal property damage, loss of use and enjoyment of property, and diminution in property value.

## COUNT III
## STATUTORY NUISANCE

112.    Plaintiffs repeat, reallege, and incorporate by reference all allegations of this Complaint as if set forth more particularly at length here.

113.    17 M.R.S.A. § 2701 states that "[a]ny person injured in his comfort, property or the enjoyment of his estate by a common and public or a private nuisance may maintain against the offender a civil action for his damages…"

114.    At all times relevant hereto, Huhtamaki knew or should have known PFAS chemicals to be hazardous and harmful to real property and human beings, and it was substantially certain that their use, emission, discharge, disposal, distribution, spreading and/or spraying of PFAS contaminated materials would cause injury to Plaintiffs and their property.

115.    As a direct and proximate result of Huhtamaki's use, emission, discharge, disposal, distribution/ spreading and/or spraying of PFAS contaminated materials, Huhtamaki are liable for damages under 17 M.R.S.A. § 2701, including damages for real property damage (presently and in the future), out of pocket expense (including expenses to remove and/or remediate the contamination of their properties), personal property damage, loss of use and enjoyment of property, and diminution in property value.

116.    Plaintiffs' land, property and water have been specially harmed by contamination from Huhtamaki's PFAS containing byproducts and residuals.  Each Plaintiff has received elevated test results indicating that their land, property and/or water contain well above normal and safe levels PFAS.

## COUNT IV
## TRESPASS

117.    Plaintiffs repeat, reallege, and incorporate by reference all allegations of this Complaint as if set forth more particularly at length here.

118.     At all times relevant hereto, Huhtamaki knew or should have known PFAS chemicals to be hazardous and harmful to real property, animals, and human beings, and it was substantially certain that their PFAS use, emission, discharge, disposal, distribution, spreading, and/or spraying of PFAS contaminated materials would cause injury to Plaintiffs' properties.

119.     Huhtamaki, through their activities alleged herein, allowed PFAS to enter and contaminate Plaintiffs' properties.  They intentionally, knowingly, and negligently used, discharged, spread, deposited, and/or sprayed toxic PFAS-contaminated materials knowing that those toxins would contaminate the real property and drinking water of individuals like Plaintiffs.

120.     Huhtamaki, through their activities alleged herein, authorized, requested, or caused others to dispose of waste in a manner that they knew was substantially likely to cause PFAS to enter and contaminate Plaintiffs' properties.  Through their actions in intentionally causing others to spread their waste, they intentionally, knowingly, and negligently caused PFAS-contaminated materials to enter Plaintiffs' land, water, and bodies.

121.     At all times Huhtamaki was aware that its conduct in disposing of PFAS-contaminated waste was contrary to Plaintiffs' rights in their properties.

122.     At all times, Huhtamaki's conduct displayed indifference to and disregard for Plaintiffs' rights to their land.

123.     Huhtamaki, through its PFAS use and disposal activities alleged herein, failed to act in the matter of an ordinary, careful person or business.

124.     Huhtamaki's intentional, knowing, and negligent contamination, and continuing contamination, of Plaintiffs' real and personal property with PFAS toxins has interfered with the rights of Plaintiffs to use and enjoy their properties and constitutes

trespass and continuing trespass. Huhtamaki's trespass has substantially impaired Plaintiffs' rights in the use, exploitation and enjoyment of their properties as alleged above.

125.    Huhtamaki's trespass has also interfered with and continues to interfere with Plaintiffs' ability to enjoy their properties, to avail themselves of their properties' value as an asset and/or source of collateral for financing, and to use their properties in the manner that each Plaintiff so chooses.

126.    Huhtamaki's trespass has proximately caused (presently and in the future) contamination of Plaintiffs' real and personal property, out-of-pocket expense, loss of use and enjoyment of property, diminution in property value, lost profits, aggravation, and inconvenience.

## COUNT V
## ABNORMALLY DANGEROUS ACTIVITY/ULTRAHAZARDOUS ACTIVITY/STRICT LIABILITY

127.    Plaintiffs repeat, reallege, and incorporate by reference all allegations of this Complaint as if set forth more particularly at length here.

128.    Huhtamaki produced and discharge PFAS-contaminated byproducts which were incorporated into sludge/biosolids which were placed on, or near, Plaintiffs' properties as fertilizer or soil enhancers.  This activity resulted in PFAS contamination of Plaintiffs' property and/or water.

129.    Huhtamaki knew its waste products, having been generated by the manufacturing of paper products containing PFAS chemicals, were highly contaminated with PFAS toxins.

130.    This activity:

    a.    Has a high degree -- almost certain in fact -- of causing significant harm to the person or lands of individuals like Plaintiffs;

b. cannot be made safe by the exercise of reasonable care;

c. is not a matter of common usage; and

d. was inappropriate in the locations where it took place.

131. Huhtamaki discharged these PFAS contaminated materials which were incorporated into biosolids used as fertilizer and/or soil enhancers on or nearby adjacent to residences like Plaintiffs' properties. Huhtamaki knew that its PFAS contaminated waste would contaminate the soil, property and water where ever it ended up in the environment. Unfortunately, it ended up on Plaintiffs' properties. Huhtamaki's activities injured Plaintiffs and provided no value added to the community.

132. Huhtamaki's ultra-hazardous activities, including use, emission, discharge, disposal, distribution, spreading, and/or spraying of PFAS contaminated products, caused current actual harm and a high degree of risk of future harm to Plaintiffs.

133. PFAS toxicity, persistence in the environment and in the human body, and other properties pose an inherent and extraordinary danger of lasting contamination of property and of threats to human health.

134. The contamination of the property, drinking water, and bodies of Plaintiffs were all probable and foreseeable consequences that resulted from the Huhtamaki's use, emission, discharge, disposal, distribution and spraying of PFAS-contaminated byproducts.

135. There is a reasonable likelihood that the Huhtamaki's use, emission, discharge, disposal, distribution, and spraying of PFAS contaminated materials will result in life-threatening cancer and other illness, disease, and disease processes.

136. Because these activities are ultrahazardous, Huhtamaki is strictly liable for damages proximately resulting therefrom.

137.     As a direct and proximate result of Huhtamaki's ultrahazardous activity and the exposure to PFAS resulting therefrom, Plaintiffs presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property and the fruits thereof, diminution in property value, lost profits, annoyance, upset, aggravation, and inconvenience.

## CAUSES OF ACTION AGAINST THE CHEMICAL COMPANIES

### COUNT VI
### NEGLIGENCE

138.     Plaintiffs repeat, reallege, and incorporate by reference all allegations of this Complaint as if set forth more particularly at length here.

139.     The Chemical Companies knew or should have known that PFAS chemicals, which they were designing, researching, testing, marketing, supplying, promoting, packaging, selling, and/or distributing, were unsafe and unfit for use because of the dangers to those who would be exposed to those chemicals. The Chemical Companies knew or should have known that the PFAS chemicals which they were designing, researching, testing, marketing, supplying, promoting, packaging, selling, and/or distributing to Huhtamaki would remain toxic in residuals and byproducts of Huhtamaki's manufacturing processes.

140.     The Chemical Companies owed Plaintiffs duties to exercise reasonable care in designing, researching, testing, marketing, supplying, promoting, packaging, labeling, selling, and/or distributing PFAS chemicals into the stream of commerce.  Those duties included, without limitation, a duty to warn both those in privity of contract with them and those whose exposure to the toxic chemical was reasonably foreseeable, including

those who would be exposed to PFAS-containing, toxic residuals and byproducts of the manufacturing processes upon the disposal of those residuals and byproducts.

141. The Chemical Companies failed to exercise reasonable care in the designing, researching, testing, marketing, supplying, promoting, packaging, selling, and/or distributing of PFAS chemicals. The Chemical Companies knew or should have known that persons foreseeably exposed to PFAS chemicals were placed at a high risk of suffering unreasonable and dangerous side effects. Plaintiffs have suffered loss of enjoyment of property due to the contamination of their soil, water and homes.

142. Plaintiffs were foreseeable victims located within the scope of the risk created by the Chemical Companies' conduct. Specifically, Plaintiffs live in an area that is geographically proximate to the locations of the mills in which the Manufacturing Defendants' products were used in manufacturing processes that created PFAS-containing residuals and byproducts. It was foreseeable, therefore, that if the PFAS-containing residuals and byproducts were not properly disposed by Huhtamaki, those toxic materials would contaminate the land and waters close to the mills and cause harm to people living near the mills, including Plaintiffs.

143. The Chemical Companies owed both Huhtamaki and Plaintiffs a duty of reasonable care commensurate with the risk of selling, supplying, or otherwise distributing PFAS chemicals to Huhtamaki for use at the Mill.

144. As manufacturers, distributors, suppliers, disposers and/or sellers of PFAS, the Chemical Companies knew or should have known of the extraordinary risks posed by their toxic PFAS Chemicals.

145. The Chemical Companies negligently breached their duty of care by distributing PFAS chemicals to Huhtamaki and failing to take steps to minimize,

eliminate, and/or warn about the failure to properly dispose of waste containing their PFAS Chemicals.

146.     The Chemical Companies had a duty to investigate the extent to which their PFAS Chemicals used, emitted, discharged, disposed, distributed, and/or sold was likely contaminating property at levels to materially increase nearby residents' risk of diseases.

147.     The negligence of the Chemical Companies, their agents, servants, and/or employees included, but was not limited to, the following acts and/or omissions:

    a.    Failing to adequately, sufficiently, and properly test PFAS chemicals;

    b.    Failing to provide adequate cautions and warnings with their PFAS products to protect both the environment and the health of persons who would reasonably and foreseeably be exposed to their PFAS Chemicals if users were not warned that they must be properly disposed of;

    c.    Negligently marketing, advertising, and recommending the use of PFAS chemicals without sufficient knowledge as to their dangerous propensities;

    d.    Negligently representing that PFAS chemicals were safe for use for their intended purpose when, in fact, they were unsafe;

    e.    Negligently selling PFAS chemicals with inadequate, false, and misleading labels.

148.     As a direct and proximate result of the Chemical Companies' negligent conduct and omissions, Huhtamaki discharged, distributed, disposed of, and/or spread waste products laden with Chemical Companies' PFAS Chemicals in a manner that allowed them to reach Plaintiffs' property.  Had Chemical Companies properly warned

Huhtamaki of the hazardous nature of their PFAS Chemicals, Huhtamaki would have used safer alternative products or insured its waste, laden with Chemical Companies' PFAS Chemicals, was properly disposed of to ensure that those chemicals would never reach Plaintiffs or their property.

149.     Plaintiffs presently suffer, and will continue to suffer in the future, real property damage, out-of-pocket expenses, personal property damage, loss of use and enjoyment of property, lost profits, diminution in property value, annoyance, upset, aggravation, and inconvenience.

## COUNT VII
## STRICT LIABILITY – FAILURE TO WARN

150.     Plaintiffs repeat, reallege, and incorporate by reference all allegations of this Complaint as if set forth more particularly at length here.

151.     The Chemical Companies engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting PFAS Chemicals, and through that conduct have knowingly and intentionally placed PFAS Chemicals into the stream of commerce with full knowledge that those products would be utilized in the production of paper products by Huhtamaki and resulting in waste containing their toxic PFAS Chemicals.  Chemical Companies further new that, without adequate warning, Huhtamaki would discharge, distribute, dispose of, and/or spread PFAS laden waste products in a manner that would allow them to be released into the environment and contaminate properties, like those owned by Plaintiffs.  Plaintiffs therefore are persons whom the Chemical Companies might reasonably expected to be exposed to and be affected by the PFAS chemicals that the Chemical Companies designed, manufactured, produced, and marketed, and sold to Huhtamaki.

152.     The Chemical Companies did in fact sell, distribute, supply, manufacture, and/or promote their PFAS Chemicals. Additionally, the Chemical Companies knew, or reasonably should have foreseen, that their PFAS Chemicals when sold, distributed, supplied, manufactured, and/or promoted to Huhtamaki would reach Plaintiffs, or someone like Plaintiffs, without any substantial change in the essential features of the PFAS chemicals from their state when initially manufactured and distributed to Huhtamaki; which is what actually happened.   That is, the Chemical Companies expected, or reasonably should have foreseen, that the PFAS chemicals in the products sold to Huhtamaki would persist after the manufacturing process and remain present, unchanged, and toxic in the residuals and byproducts of Huhtamaki's manufacturing processes.

153.     At the time of manufacture, the Chemical Companies knew, or in the exercise of ordinary care, should have known that:

      a.      Without adequate warnings, which were not provided, waste containing their PFAS Chemicals would enter the environment uncontained and pollute the ground and water, including residential well water; and

      b.      The Chemical Companies' PFAS Chemicals were designed, manufactured, and sold such that they were likely to be inhaled, ingested, and absorbed into the bodies of people in the community whose water and/or land was contaminated by their PFAS Chemicals.

154.     At all relevant times, the Chemical Companies' PFAS Chemicals were in a defective condition such that it was unreasonably dangerous to those exposed to them and was so at the time they were distributed by the Chemical Companies and at the time

Plaintiffs were exposed to and/or ingested the chemicals. The defective condition of PFAS Chemicals was due in part to the fact that it was not accompanied by proper warnings regarding its toxic qualities and possible health effects as a result of exposure. That defective condition was not a common propensity of the PFAS Chemicals that would be obvious to a user of those products.

155. The Chemical Companies failed to include or otherwise provide a necessary warning or caution statement that, if complied with, would have prevented the damages suffered by Plaintiffs.

156. The Chemical Companies could have revised the label for PFAS Chemicals to provide additional warnings.

157. This defect resulted in significant damage to Plaintiffs, whose properties were contaminated with Defendants' PFAS Chemicals.

158. At all relevant times, the Chemical Companies had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain, supply, warn, and take such steps to assure that the product did not escape into the environment and cause damages such as those suffered by Plaintiffs.

159. The Chemical Companies labeled, distributed, and promoted a product that was dangerous and unsafe for the use and purpose for which it was intended.

160. The Chemical Companies failed to warn of the nature and scope of the health risks associated with PFAS, namely its toxic properties and its propensity to cause or serve as a substantial contributing factor in the development of various serious diseases.

161. The Chemical Companies knew of the probable consequences of exposure to PFAS. Despite this fact, the Chemical Companies failed to exercise reasonable care to warn of the dangerous toxic properties and risks of developing various diseases, even

though these risks were known or reasonably scientifically knowable at the time of distribution.

162.    At the time of exposure, Plaintiffs could not have reasonably discovered any defect in PFAS through the exercise of reasonable care.

163.    The Chemical Companies, as manufacturers and/or distributors of PFAS, are held to the level of knowledge of experts in the field. There was unequal knowledge with respect to the risk of harm, and the Chemical Companies, as manufacturers of PFAS products, possessed superior knowledge compared to Plaintiffs and Huhtamaki and knew or should have known that harm would occur in the absence of a necessary warning.

164.    Plaintiffs and Huhtamaki reasonably relied on the skill, superior knowledge, and judgment of the Chemical Companies.

165.    Had the Chemical Companies properly disclosed the risks associated with PFAS, neither Plaintiffs, nor their properties, would never have been exposed to excessive levels of the toxic chemicals because Huhtamki would have either not used those toxic PFAS Chemicals or it would have properly disposed of their PFAS laden waste.

166.    The information that the Chemical Companies did provide failed to contain adequate warnings and precautions.  Adequate warnings and precautions would have enabled users, like Huhtamaki, to use the product safely and to properly dispose of waste contaminated with the PFAS Chemicals. Instead, the Chemical Companies disseminated information that was inaccurate, false, and misleading, and that failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of, exposure to and/or improper disposal of PFAS contaminated waste products; continued to promote the efficacy of PFAS, even after they knew or should have known of the unreasonable risks from exposure; and concealed,

downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to PFAS.

167. To this day, the Chemical Companies have failed to adequately warn of the true risks of exposure to their PFAS Chemicals, including the risks of numerous diseases which have been associated with exposure to PFAS Chemicals.

168. As a result of its inadequate warnings, Chemical Companies' PFAS Chemicals were defective and unreasonably dangerous when it left the Chemical Companies' possession and/or control, was distributed by the Chemical Companies to Huhtamaki, and when those toxins contaminated Plaintiff's properties.

169. As a direct and proximate result, Plaintiffs presently suffer, and will continue to suffer: real property damage; out-of-pocket expenses; loss of use and enjoyment of property; lost profits and diminution in property value. These injuries will continue until their properties are completely remediated.

## COUNT VIII
## NUISANCE

170. Plaintiffs repeat, reallege, and incorporate by reference all allegations of this Complaint as if set forth more particularly at length here.

171. At all relevant times, the Chemical Companies were engaged in the chemical business and were manufacturers, distributors and/or sellers of the toxic PFAS Chemicals.

172. At all relevant times, the Chemical Companies intended and expected that the Chemical Companies' PFAS chemicals would be sold and used in the State of Maine by Huhtamaki.

173. The Chemical Companies developed, registered, manufactured, distributed, and/or sold the PFAS Chemicals with knowledge that they would be used by Huhtamaki at the Mill.

174. It is axiomatic that Plaintiffs, like all Mainers, have a right to clean land and water. As Mainers, Plaintiffs have a common right to enjoy their real property free of dangerous contamination and to live their lives without unreasonable exposure to toxic chemicals.

175. At all times relevant hereto, the Chemical Companies knew or should have known that PFAS chemicals are hazardous and harmful to real property, animals, and human beings. At all relevant times, it was substantially certain that the Chemical Companies' distribution and/or sale of the PFAS Chemicals without proper warnings would would cause injury to properties, like those owned by Plaintiffs.

176. The Chemical Companies owed a duty to those whom they could reasonably foresee were likely to come in contact with the Chemical Companies' PFAS Chemicals or otherwise be in or near places where they were being or deposited, including Plaintiffs, to provide and maintain a healthful environment in connection with the design, manufacture, and distribution of the PFAS Chemicals for use by the Huhtamaki.

177. When the Chemical Companies designed, manufactured, and distributed PFAS for use by Huhtamaki, and designed, formulated, packaged, labeled, and distributed Defendants' PFAS Chemicals without adequate warnings, it was reasonably foreseeable and in the exercise of reasonable care that the Chemical Companies knew, or in the exercise of ordinary care, should have known that:

    a.  The Chemical Companies' PFAS chemicals were designed, manufactured, and sold such that they would likely be disposed of

in such a manner as to contaminate the environment as well as properties such as those owned by Plaintiffs.

178. In doing so, the Chemical Companies created a condition that was harmful to Plaintiffs' property and threatened their health.

179. The Chemical Companies' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute invasion of the property rights of Plaintiffs.

180. Plaintiffs, unlike the public generally, have suffered specific injuries as a result of the Chemical Companies' tortious conduct. As demonstrated by the DEP test results, many tests of private water wells have not revealed contamination; and the vast majority of wells in and around Somerset County were not tested as DEP has no reason to believe they are contaminated.

181. The Chemical Companies' distribution and/or sale of their PFAS Chemicals without adequate warnings and the resulting contamination of Plaintiffs' property constitutes both a public and a private nuisance. This nuisance has caused Plaintiffs to presently suffer, and cause such suffering in the future, real property damage, out of pocket expense (including expenses to remove and/or remediate the contamination of their properties), personal property damage, loss of use and enjoyment of property, lost profits and diminution in property value. These injuries will continue until their properties are completely remediated.

## COUNT IX
## STATUTORY NUISANCE

182. Plaintiffs repeat, reallege, and incorporate by reference all allegations of this Complaint as if set forth more particularly at length here.

183.    17 M.R.S.A. § 2701 states that "[a]ny person injured in his comfort, property or the enjoyment of his estate by a common and public or a private nuisance may maintain against the offender a civil action for his damages…"

184.    At all times relevant hereto, the Chemical Companies knew or should have known their PFAS Chemicals to be hazardous and harmful to real property and human beings, and it was substantially certain that their distribution and/or sale of PFAS Chemicals to Huhtamaki would cause injury to properties like those owned by Plaintiffs.

185.    As a direct and proximate result of the Chemical Companies' distribution and/or sale of their PFAS Chemicals, Chemical Companies are liable for damages under 17 M.R.S.A. § 2701, including damages for real property damage (presently and in the future), out of pocket expense (including expenses to remove and/or remediate the contamination of their properties), personal property damage, lost profits, loss of use and enjoyment of property, and diminution in property value.

186.    Plaintiffs' have been specially harmed by contamination from the Chemical Companies' PFAS chemicals. Each of the Plaintiffs' properties has received elevated test results indicating that their land, water, and/or bodies contain well above normal and safe limits for PFAs contamination.


**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, respectfully request that the Court enter judgment in their favor and against all Defendants, jointly and severally, or in proportion to the share of contamination each Defendant can prove it is responsible for, as follows:

   a. For an award of damages, nominal and compensatory damages, as allowed by law and in an amount to be determined by a jury for all injuries alleged herein;

b. For an award of the cost of abating and remediating Plaintiffs' lands, homes and waters from toxic PFAS contamination;

c. For an award to Plaintiffs in an amount sufficient to compensate them for real property damage, out of pocket expense, lost economic opportunity costs, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term contamination remediation and loss of income/profits from their lands;

d. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

e. For prejudgment and post judgment interest on all amounts awarded;

f. Such other and further relief as this Court may deem just and proper. Plaintiffs are not seeking personal injury damages.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.


Dated:  September 6, 2024                    Respectfully submitted,

                                              /s/ *Russell Abney*
                                             _____
                                             Russell Abney
                                             **WATTS GUERRA LLP**
                                             State Bar No. 00818100
                                             811 Barton Springs Rd., Ste. 725
                                             Austin, TX 78704
                                             Telephone: (512) 479-0500
                                             Telephone: (210) 448-0500
                                             Facsimile: (512) 479-0502
                                             russ@wattsllp.com
                                             *Lead Counsel for Plaintiffs*

Terry Garmey, Esq., Bar No. 1656
Alexis Garmey Chardon, Esq., Bar No. 5932
Christopher A. Harmon, Esq. Bar No. 5432
**TERRY GARMEY & ASSOCIATES**
482 Congress Street, Suite 402
Portland, Maine 04101
Telephone: (207) 899-4644
tgarmey@garmeylaw.com
achardon@garmeylaw.com
charmon@garmeylaw.com
*Local Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the date set out below, I electronically filed the foregoing document using the Court's CM/ECF system. Pursuant to Rule 5(d)(1)(B) of the Federal Rules of Civil Procedure, no certificate of service is required when a paper is served by filing it with the court's electronic-filing system.

Date:   September 6, 2024              By:     /s Russell T. Abney